REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1308

SEPTEMBER TERM, 2014

_____

PRINCE GEORGE'S COUNTY,
MARYLAND

v.

STEVEN MORALES

_____

Wright,
Arthur,
Salmon, James P.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Salmon, J.

_____

Filed:  November 30, 2016

In this appeal, we apply lessons from scope of employment cases involving off-duty police officers, to a judgment stemming from an altercation between Steven Morales, appellee, and Dominique Richardson, an off-duty Prince George's County police officer who was working an "extra-duty" job as security at a college fraternity party, in violation of a police department policy prohibiting officers assigned to light duty from engaging in such employment. Alleging battery, excessive force, and other torts, Morales filed suit in the Circuit Court for Prince George's County, against Richardson and Prince George's County, Maryland ("the County").[1] The County removed the lawsuit to the United States District Court for the District of Maryland, which dismissed the federal claims and remanded the remaining state law claims. *See Morales v. Richardson*, 841 F.Supp.2d 908, 914-15 (D. Md.), *aff'd*, 475 Fed.Appx. 894 (2012).

After the circuit court denied the County's motions to dismiss and for summary judgment, Morales's claims were tried before a jury from May 5-14, 2014. During trial, the court denied the County's motions for judgment. The jury found that Richardson used excessive force while acting within the scope of his employment by the County. The County was held liable, on a *respondeat superior* basis, for Richardson's use of excessive force in violation of Article 26 of the Maryland Declaration of Rights. The court later denied the County's motion for judgment notwithstanding the verdict ("JNOV") or a new trial. Judgment was entered against

---

[1] Other claims and defendants are not relevant to this appeal.

the County and Richardson jointly, in the full amount of the jury's award of $121,140.98.[2]

In this appeal, the County raises two questions:

> I. Did the circuit court err when it denied the County's motion for summary judgment, motions for judgment at trial, and motion for judgment notwithstanding the verdict on the issue of scope of employment?

> II. Did the circuit court err when it gave jury instructions that were inapplicable to the facts of the case?

We shall hold that the trial court did not err in allowing the jury to decide the scope of employment question or in instructing the jury. There was sufficient evidence that the off- duty officer was acting within the scope of his employment as a police officer in taking police action against Morales, notwithstanding the fact that he violated the County's policy against officers working extra-duty employment while assigned to light duty.

## I. FACTUAL AND LEGAL BACKGROUND

### A. The Altercation

The University of Maryland at College Park chapter of the Omega Psi Phi fraternity hired Prince George's County Police Officer Dominique Richardson to provide security for a Halloween party to be held at an off-campus warehouse in Beltsville, on October 29-30, 2010. Richardson recruited several other officers and an acquaintance to help provide security at the

---

[2] The jury awarded $15,940.98 for past medical expenses, $5,200 for future medical expenses, and $100,000 for non-economic damages.

2

event. Although Richardson drove his personal vehicle to the Halloween party, other officers arrived in police cruisers. Richardson wore his gunbelt and service firearm, handcuffs, his police badge on a chain around his neck, a shirt with "PGPD" lettering, a ballistic vest, and other gear issued by the Prince George's Police Department ("PGPD").

Richardson, who was supervising all the officers and security personnel throughout the event, initially established separate entry lines for fraternity members, those with advance tickets, and those who wanted to buy tickets at the door. Aware that the warehouse had reached capacity and that "[p]eople were starting to become obnoxious up front[,]" Richardson stationed himself at the front doors of the warehouse, which were at the top of a divided staircase. He stopped more people from entering, but "[p]eople were trying to push into . . . the double doors, and they were all trying to force their way up the stairway." In an effort to move the crowd away from the front entrance, Richardson instructed other police officers to activate their cruiser lights and sirens.

Steven Morales and a friend arrived at the party around 12:40 a.m, when there were no longer any lines at the warehouse. There was, however, a large crowd in front of the steps to the entrance doors, which were closed and guarded by security officers. Morales, whose father is a police officer employed by the District of Columbia Metropolitan Police Department, saw security people wearing purple shirts and PGPD police officers wearing badges.

Although Morales had purchased an advance ticket to the party, he waited outside in the

cold for approximately forty-five minutes, unaware "that the party inside was too full[.]" During that time, he gradually moved toward the entrance as more people arrived and "the crowd start[ed] to really get rocked back and forth." While he waited, the police cruisers next to the entrance intermittently sounded its siren as a crowd control measure.

When Morales reached the front of the warehouse, he encountered Officer Richardson, who was wearing a Prince George's County Police "badge around his neck" and the same type of "BDU" blue pants that Morales's father wore to work. Richardson was standing on the first step of the stairs leading to the entrance doors. Richardson, at 6'5" and 310 pounds, had experience as a boxer; Morales, at 5'7" and 140 pounds, had no such experience.

Because Morales was being pushed around as the crowd was "surging back and forth," he held up his ticket and twice asked Richardson for help. The first time, Richardson told him "to get back in line[,]" even though "there wasn't any line" and Morales "was stuck with everybody" at the bottom of the steps. The next time, according to Morales, "Officer Richardson struck me without me doing anything to him."

At trial, Morales described the altercation as follows:

I was trying to show Officer Richardson, that, hey, I have a ticket. Can you get me in since I am right in front. But at no time, you know, no other words, no negative words were exchanged, just me asking for help. . . .

He was on one of these steps. I believe it was the first step right here, and I am on the ground. Officer Richardson, he's a pretty big guy. So on top of him being a pretty big guy, he was already on one of the steps above me. So, there was no way of me trying to go around him, that the doorstep, the rails, it's not big at all, so where you can go around with another – I don't know how to say – a person of his

4

size.  So, especially not a police officer which I clearly . . . identified him as one, I would never do something. . . .

I saw his badge.  He had a badge. . . . PG County badge. . . . It was on a chain. . . . .

Then the crowd . . . pushed us or pushed, and I went forward.  The next thing I felt was a hand go around my neck. . . . It was Officer Richardson's hands. . . .

He pulls me up, and I try to get his hand off of my neck.  So, the next thing I see is he takes his right hand and he punches me in the mouth. . . .

When he hit me, it was . . . a hard hit. . . . I remember my feet leaving the ground, and I flew back and hit my head on the concrete. . . .

Well, my head hit and I kind of opened my eyes and sat up.  I saw Officer Richardson come down from the step and come toward – come at me. He came at me.  And after that, I remember us being on the ground. . . . I saw him put his arm back up to strike me again, and . . . I was like shielding my face because I didn't want that to happen again, to get hit in the face again.

So, I am kind of just trying to get away from him.  And he gets a'hold of me and puts me in a chokehold, puts his right arm over my neck.  I can't breathe at this point.

Morales said he was in the chokehold "for maybe like ten seconds" and "couldn't breathe" because "[h]e cut my air off[.]"  Photos taken later that morning showed marks on Morales's neck where his rosaries had been pressed into his body during the hold.

When Richardson released Morales, PGPD Officer Luis Perez picked him up and put him against a police cruiser that was "right next to" him, causing Morales to believe that he was "getting arrested or detained[.]"  As Morales had his "hands on the car," Richardson told Morales to "get the fuck out of here."  Although Morales was bleeding and injured, Richardson

5

did not ask his name or offer first aid.

Richardson gave a different account of how the altercation took place. That account is set forth below. He confirmed, however, that he punched Morales in the face, pinned him on the ground, and used an arm hold and other police-trained restraint techniques against Morales. According to Richardson, he announced to the crowd of people attempting to enter the party that no one else would be allowed inside because it was too crowded. When he first saw Morales, the latter was in the crowd of people who were pushing each other, and one woman had just fallen. Morales asked Richardson to let him in because he had a ticket. When Richardson told Morales he was not coming in, Morales kept saying, "[N]o, I have a ticket. I have a ticket; I'm coming in."

As Richardson was escorting the woman who had fallen, he felt "a push against" him. According to Richardson, Morales pushed him in an attempt to get past him into the warehouse. Using a "redirection" technique learned in his riot training, Richardson put his "hand up on [Morales's] chest "to keep him at bay" and told him he was "not coming in" and "there is nothing else to talk about." Morales replied, "F that, I have a ticket." When Morales again made an advance, Richardson "put [his] hand up again." Morales then slapped Richardson's hand off and said, "get the fuck off of me." Richardson put his hand "back up on his chest again for the third time." After Morales "took another swipe at" the officer, Richardson "felt as though it was necessary to defend" himself. According to Richardson, he viewed Morales as a

6

threat

> [b]ecause any time that you give somebody three commands to leave, and they are not going to do so, from my training and experience, verbal judo, as they call it, has been thrown out the door. You're not going to get this person out of here without some type of physical exertion. That's when I went to the escort technique, and that's when it went to the actual altercation. . . .

That's an assault on a police officer.

Although he "was heading for [Morales's] chest," Richardson "ended up accidentally hitting him in the mouth," because Morales "kind of ducked down a little bit[.]" After Richardson hit Morales, they both fell to the ground. Although Morales initially got on top of Richardson, the officer was eventually able to gain control of Morales. Officer Perez then "helped Mr. Morales up and placed him on the cruiser." Cursing because "the whole situation was stupid, could have all been prevented," Richardson told "Morales to get the . . . out of here." Although Morales was hurt and bleeding, Richardson did not offer medical attention because they "still had the crowd . . . to deal with."

Morales testified that because a friend was "taking care of somebody that was sick[,]" he drove himself home to Charles County, where he woke his parents to tell them what happened. Appellant's father, Luciano Morales, called the Charles County Sheriff's Department. Someone in the Sheriff's office advised Luciano Morales and his son to go back to Beltsville to make a report. Luciano Morales told his son not to clean himself up "[b]ecause they had to see what happened to" him. Accompanied by his wife, his daughter, and Steven, and dressed in uniform

7

for his upcoming shift, Luciano Morales drove to the warehouse, where his son identified Richardson as his assailant. At Morales' request, several other officers and a supervisor were called to the scene and photos were taken. At 4 a.m., on October 30, 2010, Richardson prepared a use of force report regarding the altercation.

After reporting the assault, Steven Morales received medical care for his injuries, first at a hospital emergency room and later from a dentist, an oral surgeon, and a prosthodontist. His mouth had been cut inside and out. One of his front teeth was split in half and could not be saved. In the ensuing months, Morales "would dream about Officer Richardson" and "always see his face." His schoolwork suffered because the assault "was something that was just always on [his] mind." Eventually, he received therapy that helped these conditions.

Based on Richardson's allegations, as set forth in his application for criminal charges, assault and other charges were filed against Morales on March 5, 2011. Those charges were *nol prossed* on May 27, 2011.

As a result of the Morales incident, an internal affairs investigation and then a criminal prosecution were initiated against Richardson. Richardson was acquitted on second-degree assault charges stemming from the altercation. Richardson resigned from the PGPD in December 2012.

### B. Duty Status of Dominique Richardson

Although Morales was not aware of Officer Richardson's off-duty status on the night of

the party, it was undisputed that on that night Richardson was off-duty and otherwise restricted to light duty assignments as a result of recent knee surgery. Under the County's written policy, which is set forth in our discussion below, officers are not permitted to work "extra-duty" employment while on "no duty" or "light duty" assignment. Moreover, officers are required to request permission to work any extra-duty job.

After his knee surgery in June 2010, Richardson reported to the County police department's Risk Management Division because he was on no duty status. Sergeant Christine O'Hagan testified that Richardson was transferred to her squad at the District I Hyattsville Station during the summer of 2010, but Richardson never reported to work because of his no duty status. On October 5, 2010, Richardson told Sgt. O'Hagan that his "doctor extended his no duty status for approximately another month until he went back to the doctor."

On October 18, 2010, the Medical Advisory Board, having reviewed Richardson's case, ordered him back to light duty status, effective October 20. As a result of the change in his duty status, Richardson was required to report to work at the District I Hyattsville Station, under the supervision of Sergeant Miranda Reed. But Richardson told Sgt. Reed that his doctor "wanted to do something more with his knee" and that he planned to use sick leave until his next doctor's appointment.

Sgt. Reed testified that Richardson was not authorized to work secondary employment while on either light duty or no duty status, pursuant to PGPD General Orders. Moreover,

9

Richardson admitted that he did not seek authorization to work the fraternity party or notify supervisors that he was doing so. He explained that although he planned only to recruit other officers to work the event, he was unable to find enough to perform the assignment. He was paid solely by the fraternity for his services that night.

After learning of the incident with Morales and that Richardson had worked extra-duty employment, Captain Timothy Muldoon contacted Sgt. O'Hagan and instructed her to order Richardson to report for full duty assignment. Sgt. O'Hagan called Richardson in the morning on October 30th and left him a message ordering him to report to work that evening. Richardson returned her call to "advise . . . that the doctor said that he could come back to work."

When Richardson reported to the District I Hyattsville Station on the evening of October 30, 2010, he submitted an Attending Physician Form that indicated he had been authorized to return to full duty, effective that day. After reviewing that document, Lieutenant Timothy Hatfield, Captain Muldoon, and Sergeant O'Hagan believed the form had been altered. Hatfield told Richardson to get a new form from his doctor.

Richardson testified that he called his doctor's office on October 30, and a nurse told him that he was cleared for full duty. He admitted that he altered the Attending Physician Notification Form, by removing the check the physician had placed in the "no duty" box and instead checked the "full duty" box. Richardson returned to his physician's office on November

to pick up a revised form placing him on full duty status effective October 30, 2010.

## C. Legal Proceedings

In its memorandum order dismissing the federal claims and remanding the remaining state law claims, the United States District Court for the District of Maryland ruled that Morales failed to state a federal constitutional claim against the County because he did not allege facts showing "that Richardson's actions . . . were taken 'under color of state law.'" 841 Fed.Supp.2d at 913. In *dictum*, the court also noted that the allegations of Morales's original complaint failed to state facts sufficient to establish that Richardson was acting within the scope of his PGPD employment. The Fourth Circuit, in an unpublished per curiam opinion, affirmed the dismissal of Morales's federal claims. *See Morales v. Richardson*, 475 F.Appx. 894 (4th Cir. 2012).

After remand from federal court, Morales filed an amended complaint revising his allegations relevant to the scope of employment issue and asserting in Count I a constitutional tort claim against Richardson and the County, based on the use of excessive force. The County moved to dismiss that claim, or in the alternative for summary judgment, arguing that as a matter of law Richardson was not acting within the scope of his employment with the County. The circuit court denied that motion. After the parties completed discovery, the County filed a second motion for summary judgment, which was granted before Morales filed opposition. When Morales filed his opposition and moved for reconsideration, another judge reconsidered the ruling and denied summary judgment.

Trial was held on May 5, 6, 7, 8, 12, 13, and 14, 2012. At the close of Morales's case, the County moved for judgment on the remaining claims against it, on the ground that there was insufficient evidence that Richardson was acting within the scope of his employment for the County. The trial court denied the motion. When the County renewed its motion for judgment at the close of evidence, the court again denied the motion.

The jury found that Richardson battered Morales and used excessive force while acting within the scope of his employment by the County. The County, having been held liable as Richardson's employer, moved for a JNOV, reasserting its objections to certain jury instructions and its argument that Richardson could not have been acting within the scope of his PGPD employment because (1) he was prohibited from working extra-duty employment while assigned to light duty, and (2) he was hired and paid to work the event solely by the fraternity. The trial court denied that motion.

## DISCUSSION

### I. Scope of Employment

The County contends that the trial court erred in denying its various motions for judgment, made in the course of multiple requests before, during, and after trial. In the County's view, Officer Richardson's "light duty" status is dispositive, because his extra-duty employment by the fraternity was expressly prohibited, so that during the altercation with Morales, as a matter of law, he could not have been acting within the scope of his employment by the County.

For the same reasons, the County maintains that the trial court abused its discretion in denying its motion for a new trial.

## Appellate Review of Motions for Judgment

To the extent the County seeks relief from the denial of its motions for summary judgment, those rulings were mooted by subsequent proceedings, which included motions for judgment during trial, a motion for judgment notwithstanding the verdict (JNOV), and a motion for a new trial. *See Adams v. Manown*, 328 Md. 463, 472 n.4 (1992). Accordingly, the issue is whether the County is entitled to judgment (or a new trial) as a matter of law on the record as it stands at the conclusion of the trial. *Id.*

Maryland Rule 2-519, which governs motions for judgment, provides that, "[a] party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted." Appellate courts reviewing the denial of a motion for judgment during a jury trial perform the same task as the trial court, affirming the denial of the motion "if there is 'any evidence, no matter how slight, that is legally sufficient to generate a jury question.'" *C&M Builders v. Strub*, 420 Md. 268, 291 (2011) (citations omitted). In this civil case, the evidence is legally sufficient to support the scope of employment finding if, from the evidence adduced at trial, viewed most favorable to Morales, any reasonable fact finder could find by a preponderance of the evidence that in using

13

excessive force against Morales, Richardson was acting within the scope of his employment by the County. *See Hoffman v. Stamper*, 385 Md. 1, 16 (2005). "In a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion." Md. Rule 2-532. Denial of a motion for JNOV is reviewed under the same standard as denial of a motion for judgment. *See Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md. App. 321, 329 (2012). Thus, we may reverse the denial of the County's motion for a JNOV only "'[i]f the evidence . . . does not rise above speculation, hypothesis, and conjecture[.]'" *French v. Hines*, 182 Md. App. 201, 236 (2008) (citations and internal quotation marks omitted). A motion for a new trial may be made in conjunction with a motion for a JNOV. *See* Md. Rules 5-232, 5-233.

### Scope of Employment Principles and Precedent

Under the doctrine of *respondeat superior*, local governments may be required to pay a civil judgment resulting from constitutional torts committed by its police officers within the scope of their employment and without malice. *See* Md. Code, § 5-303(b) of the Courts and Judicial Proceedings Article ("CJP") (local government must pay, up to specified limits, "any judgment against its employee for damages resulting from tortious acts . . . committed by the employee within the scope of employment with the local government"); *Lovelace v. Anderson*, 366 Md. 690, 705-06 (2001); *DiPino v. Davis*, 354 Md. 18, 51-52 (1999). Although the right to take police action includes a qualified privilege to use force, "'[i]f an officer uses excessive

14

force, or force greater than is reasonably necessary under the circumstances, the . . . . officer's nonprivileged use of force constitutes battery.'" *French v. Hines*, 182 Md. App. at 265-66 (citation omitted).

Our discussion of scope of employment principles in *Clark v. Prince George's County*, 211 Md. App. 548 (2013), provides an instructive synthesis of the scope of employment principles pertinent to this appeal. In that case, we affirmed a judgment in favor of the County on state law claims alleging torts stemming from a shooting by an off- duty police officer. *Id.* at 578. The two victims, Messrs. Clark and White, made a furniture delivery to the residence of Prince George's County police officer Washington, who was off- duty from his assignment to the Department of Homeland Security, was not wearing a uniform or badge, and did not identify himself as a police officer. *Id.* at 555, 578-79. After an altercation inside the home, Washington shot both victims with his service revolver, killing Clark and grievously wounding White. *Id.* at 553-56.

In *Clark*, as in this case, "the County only could be found vicariously liable for the common law torts of [the officer] if his actions were taken within the scope of his employment[,]" and the issue was whether "the evidence at trial generated a dispute of material fact as to whether [the officer] was acting within the scope of his employment when he shot Clark and White," so that "scope of employment was a jury question." *Id.* at 561-62. Seeking to keep the County in the case, given its ability to pay a judgment, the victims argued that

"reasonable jurors could have found that Washington was acting within the scope of his employment because he was engaged in the kind of conduct he was employed to perform – protection – right after work, in a place not unreasonably distant from his authorized area of employment, and that his conduct was actuated at least in part to serve the County." *Id.* at 562. The County sought judgment as a matter of law, pointing out that the officer "had taken off from work on the day of the shooting and his motive in shooting Clark and White was not driven by service to the County, whether he was protecting his home or himself." *Id.* Moreover, the County maintained that it "was not served by and did not derive any benefit from Washington's actions in shooting Clark and White, even if he did so in the course of a physical fight instigated by the two men." *Id.* The trial court granted judgment for the County, ruling as a matter of law that the shootings were not within the scope of the officer's employment. *Id.* at 554.

This Court affirmed. *Id.* at 590. We summarized the pertinent law governing scope of employment, as follows:

> There are many considerations relevant to whether an employee's actions were within the scope of employment. "The general test set forth in numerous Maryland cases for determining if an employee's tortious acts were within the scope of his employment is whether they were in furtherance of the employer's business and were 'authorized' by the employer." *Sawyer v. Humphries*, 322 Md. 247, 255 (1991).

> > The simple test is whether they were acts within the scope of [the employee's] employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By "authorized" is not meant authority expressly conferred, but whether the act was such as was

16

incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders.

*Id.* (quoting *Hopkins C. Co. v. Read Drug & C. Co.*, 124 Md. 210, 214 (1914), in turn quoting Wood on Master and Servant § 279 (1877)). "[T]here are few, if any absolutes. Nevertheless, various considerations may be pertinent." *Id.* **Four such considerations are that**

> **the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master.**

*Id.* (quoting *E. Coast Lines v. M & C.C. of Balto.*, 190 Md. 256, 285 (1948), in turn quoting *Mechem on Agency*, Section 36; *Huffcut on Agency*, Section 5; American Law Institute, RESTATEMENT OF AGENCY, Section 228, comment (b)). In addition, the following considerations should be taken into account:

> [C]ertain conduct of the servant may be within the scope of his employment, although not intended or consciously authorized by the master, but "(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: – (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal."

*Sawyer* at 256 (quoting *Great A. & P. Tea Co. v. Noppenberger*, 171 Md. 378, 390-391 (1937), in turn quoting RESTATEMENT OF AGENCY § 229 (1933)) (citations omitted).

The *Sawyer* Court emphasized the importance of foreseeability to the issue of scope of employment. *Id.* at 256 (citing *Cox v. Prince George's County*, 296 Md. 162, 171 (1983)). When an employee's "actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours and at an authorized locality, the employee's actions are outside the scope of his employment." *Id.* at 256-57 (citing *LePore v. Gulf Oil Corp.*, 237 Md. 591, 596-98 (1965); *Carroll v. Hillendale Golf Club*, 156 Md. 542, 545-46 (1929); *Steinman v. Laundry Co.*, 109 Md. 62, 67 (1908); *Central Railway Co. v. Peacock*, 69 Md. 257, 265 (1888)).

*Clark*, 211 Md. App. at 571-73 (secondary citations omitted).

The Court of Appeals has recognized that "the issue of whether a servant is acting within the scope of his employment is ordinarily a question for the jury[.]" *Cox v. Prince George's County*, 296 Md. 162, 170 (1983) (citations omitted). The issue of whether a police officer used excessive force, in violation of Article 26 of the Maryland Declaration of Rights, within the scope of his or her public employment has been addressed in multiple contexts. Although an officer's on-duty status is highly relevant, it is not dispositive of the scope of employment question. *Compare, e.g., Wolfe v. Anne Arundel County*, 374 Md. 20, 36-37 (2003) (as matter of law, on-duty police officer was not acting within scope of employment when he raped motorist following a traffic stop), *with Cox v. Prince George's County*, 296 Md. at 164-65, 170-71 (scope of employment could not be decided on a motion to dismiss when the complaint alleged assault

18

and excessive force by on-duty officers in the course of using a police dog to make an arrest); *French v. Hines*, 182 Md. App. at 264-66 (allegations that on-duty officer used excessive force in making a traffic stop and arrest precluded dismissal).

In resolving this appeal, we look for guidance to cases involving allegations of excessive force by off-duty police officers, focusing on when tortious actions are outside the scope of employment as a matter of law and when such actions may fall within the scope of employment so as to preclude dismissal or the grant of a motion for judgment. At one end of that spectrum is allegedly tortious conduct that is easily distinguished from this case based on its patently personal and outrageous nature. *See, e.g., Brown v. Baltimore City*, 167 Md. App. 306, 326 (2006) (off-duty police officer was not acting within scope of employment when he allegedly shot victim 17 times in belief that he was having an affair with officer's wife). On the other end of the spectrum is conduct that unquestionably qualifies as police action undertaken by an off-duty officer under patently emergent circumstances. *See, e.g., Town of Port Deposit v. Petetit*, 113 Md. App. 401, 420 (1997) (off-duty officer in personal vehicle was engaged in "governmental activity" under his "law enforcement authority" when he fired at a suspected hit and run driver during high speed pursuit).

Other cases illustrate a middle ground, where scope of employment may require a compound analysis based on a recognition that police officers who are off-duty may be called upon to take police action. For example, in *Sawyer v. Humphries*, 322 Md. 247, 257 (1991), an

19

off-duty Maryland State Trooper,[3] attired in civilian clothes and driving his personal vehicle, had two altercations with the same motorists. In the first, the trooper allegedly did not identify himself as a police officer before throwing rocks at their stopped vehicle, verbally threatening them, and then physically assaulting them. *Id.* at 250-51, 257-58. The *Sawyer* Court held that such tortious conduct was outside the scope of employment as a matter of law, because the trooper "was acting from personal motives," engaging in conduct that "would not be expectable" for a police officer, and "in no way furthering the State's interests." *Id.* at 260. In the second altercation a short time later, the trooper allegedly made a traffic stop of the same motorists, identified himself as a police officer, slapped one of them, stated that he was arresting him, and attempted to remove him from his vehicle. *Id.* at 251. The Court ruled that "whether or not the [officer's] alleged actions" during that stop "were within the scope of his employment should not have been decided on a motion to dismiss," because "the evidence at trial may show that, as a matter of law, the [trooper] was throughout acting in the scope of his employment and without malice," or "the evidence may be such that a jury issue" is presented on one or both of those

_____

[3] A Maryland State Trooper, as an employee of the State, is subject to the Maryland Tort Claims Act ("MTCA"), which establishes individual immunity for tortious acts committed without malice and "within the scope of public duties." *See* Md. Code (2014 Repl. Vol.), § 12-105 of the State Government Article. Because "'scope of public duties' [is] synonymous with 'scope of employment' for purposes of *respondeat superior* liability," cases applying the MTCA have precedential value in cases like this one insofar as they involve scope of employment. *See Sawyer*, 322 Md. at 254.

20

issues. *Id.* at 261-62.

We have found no reported Maryland cases resolving a comparable scope of employment issue stemming from tortious conduct committed by an off-duty police officer working as a private security officer in violation of a police department directive. Although *Lovelace v. Anderson*, 366 Md. 690, 721 (2001), involved an off-duty police officer working as a hotel security guard, the issue was whether there was enough evidence that the officer was acting within the scope of his employment *by the hotel* to preclude summary judgment in favor of that private employer. *Id.* at 721. Nevertheless, the Court of Appeals reiterated that "the same basic principles of Maryland agency law, for determining whether actions of employees generally are within the scope of particular employment relationships, are equally applicable to police officers." *Id.* at 721. In *Lovelace*, the off-duty Baltimore City police officer fired his service weapon in the course of responding to a robbery in the hotel lobby, inadvertently shooting a guest. *Id.* at 694. Although his private security work was authorized by the Baltimore City Police Department ("BPD"), the officer violated a written BPD Department policy that provided that if the secondary employer required the off-duty officer "'to be armed as a condition of . . . employment[,]'" then the officer was required to "'[o]btain a handgun permit from the Maryland State Police'" and would be considered "'armed under authority of [the] secondary employer.'" *Id.* at 701-02. The Court of Appeals was not called upon to decide whether the off-duty officer was acting in the scope of his employment as a Baltimore City police officer during the incident.

Nevertheless, the Court pointed to the dual employment doctrine, which is based upon "the settled principle of Maryland law that '[a] worker may simultaneously be the employee of two employers[,]'" and assumed *arguendo* that, in responding to the robbery, he was simultaneously acting within the scope of his hotel employment and taking police action within the scope of his BPD employment. *Id.* at 716-19 (citations omitted).

Similarly, the public scope of employment issue was avoided in *Espina v. Prince George's County*, 215 Md. App. 611 (2014), *aff'd on other grounds*, 442 Md. 311 (2015), involving a fatal shooting by an off-duty police officer while working as a security guard at an apartment complex. In that case, the officer was driving his marked police cruiser, wearing his PGPD uniform, and "investigat[ing] possible violations of loitering, trespassing, or open container laws." *Id.* at 620. This Court did not address how the dual employment doctrine recognized in *Lovelace* applied in that scenario, because "[t]he parties stipulated that throughout the incident, [the officer] was working within the scope of his employment as a county police officer and exercised his police powers." *Id.* at 619 n.7.

We have found just one reported case applying Maryland law to decide whether off- duty officers working as security guards were acting within the scope of their public employment when they allegedly used excessive force. In *Estate of Saylor v. Regal Cinemas*, 54 F.Supp.3d 409, 412-16 (2014), off-duty Frederick County Sheriff's deputies were working as mall security guards when they allegedly used excessive force to arrest a theater patron with Down Syndrome,

22

resulting in his death by asphyxiation. The federal court decided that, as matter of law for purposes of motions to dismiss, the deputies were acting within the scope of their public employment when they responded to a report that Mr. Saylor was sitting through a second movie without paying for a second ticket. *Id.* at 420 n.6, 422. Based on the allegations in the complaint, the court concluded that "at least by the time that the Deputies determined to arrest Mr. Saylor, they had reverted to their status as on-duty sheriff's deputies." *Id.* at 422. In support, the court cited a written policy that the deputies were authorized to take police action when circumstances warranted, reasoning that,

> [l]ike deputies in most if not all sheriff's departments in Maryland, off-duty deputies of the Frederick County Sheriff's Department revert to on-duty status where law enforcement action is taken. . . . Arrest is a quintessential law enforcement action. As such, the Deputies were acting as law enforcement officers and were potentially entitled to qualified immunity while so acting.

*Id.* at 420 n.6 (internal citation omitted).

We recognize that the federal court's "reversion" rationale in *Saylor* has limited persuasive value to the extent it is inconsistent with the Court of Appeals's rejection of an analogous "reversion" analysis undertaken by this Court in *Lovelace v. Anderson*, 126 Md. App. 667, 689 (1999), *rev'd in relevant part*, 366 Md. 690 (2001). This Court had concluded that in responding to the hotel robbery, the Baltimore City officer working as a security guard "reverted to his police officer status" as a matter of law, but the Court of Appeals disagreed. *See Lovelace*, 366 Md. at 715-16. Instead, the *Lovelace* Court relied on the principle that "a person

23

performing a given function simultaneously may be the employee of two employers[,]" *id.* at 717, in observing that, "[a]t the very least, a factual matter for the jury on this issue may have been presented." *Id.* at 715.

### The County's Challenge

After the trial court denied the County's motions for judgment concerning the scope of employment issue, the County was held vicariously liable for Officer Richardson's use of excessive force during his altercation with Mr. Morales. The County argues that the trial court should not have sent the claim to the jury because the evidence conclusively established that Richardson was acting outside the scope of his employment. In the County's view, the trial court erred in denying its motions for judgment because Richardson's "actions to prevent Morales from entering the party were tantamount to a street brawl and were purely for the benefit of the Omega Psi Phi fraternity as opposed to Prince George's County, Maryland."

In support of its contention that Richardson was acting solely in the scope of his employment by the fraternity, the County relies on *Rusnack v. Giant Foods*, 26 Md. App. 250 (1975), an inapposite case involving a private security guard, as well as unpersuasive cases from other jurisdictions recognizing that off-duty police officers acting in a private capacity may be employees of the private establishment.[4] In *Rusnack*, we held that an off- duty security guard

---

[4] As in *Lovelace* and *Espina*, the out-of-state cases cited by the County focus on the liability of the private employer, rather than the public employer. *See, e.g., Cervantez v. J. C. Penney*

(Continued…)

for a grocery store was not acting in the scope of his employment when he assaulted a customer while waiting in a check-out line. *Id*. at 266. The guard worked at a different store and was in line to make personal purchases when the victim's grocery cart bumped him. Applying the scope of employment principles reviewed above, this Court affirmed a directed verdict in favor of the store. *Id.* at 261-67. We reasoned that "[n]o matter which version" of the altercation was considered, "it cannot be fairly said that [the employee] was advancing [the employer's] interests," given that the evidence was undisputed that "he was in the store on personal business – as a customer to make some purchases." *Id.* at 266. Because the employee was not "actuated by a purpose to serve his master," or otherwise "advancing [the store's] interests," his assault of the plaintiff did not occur within the scope of his employment. *Id.* at 266.

The County argues that "this same rationale should have been applied to the facts of this case at the summary judgment stage and at trial[,]" because "no matter which version" of the

---

(…continued)
*Company*, 24 Cal.3d 579, 595 P.2d 975, 156 Cal. Rptr. 198 (1979) (when off-duty police officer, acting as a private security guard in a store, falsely arrested a customer for shoplifting, store was not entitled to judgment as a matter of law); *Blair v. Tynes*, 621 So.2d 591, 598-599 (La. 1993) (private employer was liable, under the doctrine of *respondeat superior*, for torts committed by off-duty deputy sheriffs hired to provide security); *Duryea v. Handy*, 700 So.2d 1123 (La. App. 1997) (under traditional agency principles, private employer was liable for torts of off-duty deputy sheriff); *Rand v. Butte Electric Railway Co.*, 40 Mont. 398, 408-410, 107 P. 87, 91-92 (1910) (private railroad was liable for tortious conduct of deputy sheriffs while employed as railroad trainmen); *Domanoski v. Borough of Fanwood*, 237 N.J.Super. 452, 456-457, 568 A.2d 123, 125-126 (1989) (when off-duty police officer arrested a suspected shoplifter, he was acting simultaneously as an employee of the police department and the grocery store).

25

encounter between Richardson and Morales

is accepted as correct, it cannot be fairly said that Richardson was advancing the County's interests in doing what he did at the time he did it. The only reasonable inference from the evidence is that Richardson's motivation was solely and exclusively personal and not related to his position as an employee of the County. As Richardson testified, the party, for which he was hired by a private group to provide security, was too crowded to allow anyone to enter and the incident with Morales arose from his attempt to get inside. Clearly, the County neither authorized nor derived any benefit from Richardson's actions. Given that this incident occurred while Richardson was on light duty status and he was not authorized to work secondary security employment pursuant to the County [Secondary Employment Policy], Richardson's conduct was neither expectable nor foreseeable.

Although the County acknowledges that the "dual employment doctrine may be applicable where a police officer is working for a private employer" but "then simultaneously undertakes police action," it contends that "Richardson took no police action" in this instance because "[h]e never effectuated an arrest, filed a use of force report or an incident report, or took any other police action on the date of this incident."

**Violation of Extra-Duty Policy**

Before considering other *Sawyer* factors, we separately address the County's contention that Richardson's use of excessive force was outside the scope of his PGPD employment as a matter of law because such conduct was neither expectable nor foreseeable given that Richardson was prohibited from working extra-duty employment due to his light-duty status.

The County's policy concerning "Extra-Duty Employment" provides in pertinent part:

I. POLICY

26

The nature of the duties and obligations of the Department requires that employees work irregular schedules that are subject to change to meet deployment needs.

Additionally, it is necessary that employees have adequate rest to be alert during their tour of duty. For these reasons, the Department may limit or prohibit extra-duty employment that is detrimental to Departmental objectives. . . .

III. DEFINITIONS . . . .

**Extra-duty Employment:** Any paid employment that results from being a Departmental employee, and is not County sponsored. . . .

V. PROCEDURES

References to extra-duty employment in this section mean outside employment where the actual/potential use of law enforcement powers is anticipated. . . .

Officers are permitted to work extra-duty employment subject to the restrictions stated in this directive.

1. **Limitations & Restrictions**

Extra-duty employment has the following limitations:

- *Officers on light duty shall not participate in extra-duty employment . . . .*

- Officers shall not work more than 16 hours per day (including while on authorized leave and on days off); this includes regularly scheduled tours of duty, overtime, court time, secondary employment, or a combination of the above

- Officers must have a [sic] 8 hours of rest each day (including while on authorized leave and on days off)

- Officers shall not exceed 20 hours of extra-duty employment per work week (this does not include hours worked while on authorized leave or days off) . . . .

2. **Director, Professional Compliance Division (PCD) Responsibilities**

27

The Director, PCD, shall serve as the coordinator for requests to perform extra-duty employment. The Director shall also administer the policy of the Department to allow officers to work extra-duty employment. The Director shall ensure the review of extra-duty employment requirements and sites, and may revoke authorization to work for specific individuals or work locations.

## 3. Notification to Operations

*Officers shall notify Operations prior to beginning each extra-duty employment assignment* and provide:

- Name and ID#
- Hours
- Name and address of the business
- Attire (uniform or plain clothes)

The Director, Police Communications shall maintain the extra-duty employment log for 30 days, and then forward it to the Director, PCD for disposition.

## 4. Attire

Officers working extra-duty employment shall wear the complete uniform of the day or utility uniform, as appropriate. . . .

## 5. Extra-duty Arrest Compensation

Officers will not be compensated for off-duty court appearances for arrests that result from extra-duty employment.

## 6. Extra-duty Employment Responsibilities

Officers shall handle duties stemming from incidents occurring on the premises of the off-duty employer, including reports, lookouts, and arrests.

- Officers possessing PGPD vehicles shall transport their own prisoners.
- Officers shall submit reports to a supervisor working that area or to the District where the incident occurred . . . .

Whenever an off-duty officer believes an on-duty officer should handle an incident, the officer shall notify Public Safety Communications.

**7. Liability**

*Whenever officers initiate police action because of police related services offered as part of their extra-duty employment or initiate action at the direction of the extra-duty employer, they shall have the same professional liability coverage as if they were on duty. This liability is extended as long as officers act within the scope of their duties as PGPD officers and take action under the color of law.*

(Italics added.)

The County's Extra-Duty Policy expressly contemplates "the actual/potential use of law enforcement powers" while an off-duty officer is working secondary employment generally, and security jobs specifically. We do not read this policy to automatically negate, in every instance, the authority of a PGPD police officer to take police action if the officer is working extra-duty employment without having satisfied all prerequisites for doing so. To be sure, the Extra-duty Policy establishes conditions and procedures requiring PGPD officers to forego extra-duty employment while the officer is on light duty. Yet nothing in that document forecloses a light duty officer from taking police action when circumstances warrant, in accordance with the County's "24/7 Policy," *codified at* Prince George's County Code, § 18-163. To the contrary, that law provides that

> [s]worn police officers are held to be always on duty, *although periodically relieved from the routine performance thereof*. They are subject at all times to orders from the proper authorities and to call by citizens. The fact that they may be off duty shall not be held as relieving them from the responsibility of taking proper police action in any matter coming to their attention requiring such action.

> While in the County, sworn police officers shall at all times, when apart from their own homes, be armed, unless the carrying of firearms is specifically prohibited, and carry their badge of authority.

(Emphasis added).

Under this policy, all PGPD officers, including those "relieved from the routine performance" of their duties by reason of being restricted to light duty, may take police action within the County when circumstances warrant. Accordingly, even though Richardson was on light duty, if he had been present at this event for any reason other than to work security – for example, as a ticketholder or even a "passerby" – he had authority to take police action as the unruly crowd became "agitated" and Morales allegedly became "aggressive."

We found no precedent directly addressing whether a police officer working in violation of a light duty restriction may nevertheless act within the scope of his or her public employment by undertaking police action. Nevertheless, the Court of Appeals has recognized generally that tortious actions by off-duty officers may fall within the scope of their employment even if that conduct was unauthorized and "in opposition to . . . express and positive orders" of the police department. *See Sawyer*, 322 Md. at 255 ("By 'authorized' is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders.") (citation omitted).

In some cases, an off-duty officer's violation of a written police policy has not been treated as grounds for a directed judgment. For example, in *Lovelace*, the Court of Appeals did

not treat the police officer's violation of written BPD policy requiring him to obtain a handgun permit as grounds to rule as a matter of law that the officer was acting outside the scope of his BPD employment; to the contrary, the Court assumed *arguendo* that the officer was acting within the scope of that employment. *Lovelace*, 366 Md. at 704-05, 718-19. In *Saylor*, 54 F.Supp.3d at 414-16, 420 n.6, 422, the federal court held that off-duty deputies working as mall security guards were acting within scope of public employment when they made an arrest, even though they allegedly violated established policies, by handcuffing behind his back, an obese and mentally disabled individual and fracturing his larynx in the course of "manhandl[ing]" him.

We decline to hold that Richardson's light duty status made his use of excessive force in dealing with Morales so unexpected and unforeseeable that he was acting outside the scope of his PGPD employment as a matter of law. Although the lack of authorization to work extra-duty assignments was a factor for the jury to consider regarding the scope of employment question, it was not dispositive.

## Analysis of *Sawyer* Factors

Applying the scope of employment factors identified in *Sawyer* to the facts in this record, viewed in the light most favorable to Morales, we conclude there was sufficient evidence to generate a jury question as to whether Richardson took police action against Morales, and therefore was acting within the scope of his PGPD employment. In turn, that evidence supports the jury's verdict and the denial of the County's motions seeking judgment, JNOV, and a new trial.

Richardson testified that he was hired by the fraternity because he was a police officer who was trained and experienced in securing facilities and events. In turn, he hired other PGPD officers to work the event, which was located at a publicly accessible warehouse in Prince George's County and attended by a large number of undergraduate students. Richardson, who was wearing his PGPD badge and positioned at the entrance to the warehouse, next to a marked police cruiser, was identifiable as a police officer in a position of authority during the event. In fact, that is why Morales asked Richardson for help.

Throughout the evening, Richardson used his police training, authority, and fellow officers to provide crowd management services. That became necessary as the event exceeded the building capacity, leading to the use of police vehicles and sirens in an effort to control the increasingly agitated crowd.

The large crowd included individuals who, like Morales, had purchased tickets to the party, as well as those who did not have tickets. As the number outside the warehouse grew, there were no longer any organized lines. After waiting 45 minutes in the cold night, Morales still had not gotten into the party. By that time, some people had begun to push toward the doors, causing "surges" and "rocking" that escalated the agitation and physical danger. Morales, who identified Richardson as a police officer by his uniform and actions, asked for help.

Taking the evidence in the light most favorable to Morales, there was sufficient evidence to generate a jury question as to whether Richardson took police action against Morales. Whether Richardson's punch was deliberate or accidental, it was intended to subdue Morales.

According to Richardson, he used police-trained maneuvers, including commands and physical detention, consisting of "redirection" and "escort" techniques, as well as an armhold. According to Morales, Richardson hit him and put him in a chokehold without justification. Both testified that after the altercation became physical, a second police officer intervened and placed Morales in a prone position against a marked police cruiser. From this evidence, the jury reasonably could – and apparently did – find that Richardson took police action in detaining Morales.

The use of force report is also evidence that Richardson believed his conduct constituted police action, if not during the event in general (i.e., crowd control with the use of fellow officers, police authority, police badges/uniforms/vehicles), then at least during his encounter with Morales (i.e., use of verbal commands and physical force to detain, back up by fellow police officer, and detention against marked police cruiser). An inference of police action may be drawn from Richardson's statements that Morales's actions included "Active Resistance," "Aggression," and "Assault," and that Richardson used multiple "Empty Hand Techniques," including a "Control Hold," "Escort Technique," and "Strike." Richardson testified that these are all maneuvers for which he received police training. Contrary to the County's contention, Richardson testified that he prepared this report just hours after the altercation, at 4 a.m. Although that was after Morales returned to report the incident, Richardson explained that until then, he had been working the event and responding to Morales's complaint. The timing and contents of that document were matters for the jury to consider in deciding what weight to give it.

Furthermore, the jury could infer from Richardson's testimony that in detaining Morales, he was not merely providing security services for the fraternity, but he was also providing law enforcement services for the County, by controlling an aggressive individual in a public setting where there was an escalating risk to others in the already agitated crowd. We reject the County's comparison of the altercation between Richardson and Morales to a "street brawl" between private parties, with no benefit to the County. According to both Morales and Richardson, this was a physical altercation between an identified PGPD officer who was exercising control over a large crowd, and an individual in that crowd, during which the officer used tactics for which he received police training. Thus, there was sufficient evidence to generate a jury question as to whether Richardson's restraint of Morales was motivated "at least in part to serve" the County. *See Sawyer*, 322 Md. at 255. Viewing the evidence in light of the jury's ultimate findings, it appears that the jury credited the evidence that Richardson took police action against Morales but concluded that Richardson used excessive force in doing so.

On this record, there was evidence that Richardson's conduct was "the kind" he was "employed to perform" for the PGPD, that it "occur[red] during a period not unreasonably disconnected from the authorized period of employment," "in a locality" where he was authorized to take police action, and that it was "actuated at least in part by a purpose to serve" the County. *See Sawyer*, 322 Md. at 255. That was sufficient for the jury to find by a preponderance of the evidence that, even if Richardson's crowd control duties were within the scope of his employment by the fraternity, his actions during his altercation with Morales were

within the scope of his PGPD employment.  The trial court did not err in denying the County's motions for judgment, JNOV, and a new trial.

## II. Jury Instructions

A jury instruction "must be a correct statement of the law and be applicable under the facts of the case." *State v. Bircher*, 446 Md. 458, 463 (2016), *reconsideration denied* (Mar. 24, 2016). In its alternative assignment of error, the County argues that the trial court erred in giving several inapplicable jury instructions.  We agree with Morales that the challenged instructions were correct statements of law that provided context for the issues presented to the jury.

### Agency Instructions

The County first challenges several jury instructions concerning agency authority.  It argues that the court erred in giving the pattern instruction on actual and apparent authority, MPJI-Civ. 3:10,[5] because "the County never engaged in an act that lead [sic] Morales to believe

---

[5] The court gave the substance of the following pattern instruction:

a. Actual Authority

A person or legal entity may be responsible as a principal to third parties for the actions of an agent.  The existence of a principal-agent relationship depends upon the parties' intent as evidenced by their agreements and actions.

Two elements are needed to create an agency relationship.  They are:

 (1) the consent of the principal to the agent acting on behalf of the principal; and,

 (2) consent of the agent to act for the principal.

(Continued…)

that Richardson's actions were being performed for the County's benefit."  In addition, the

County challenges the following instructions:

> The employer cannot avoid liability by imposing restrictions on the employee's conduct not known to persons dealing with the employee.

> Furthermore, the employer cannot avoid liability based on the fact that the employer did not receive a pecuniary or economic benefit from the employee's conduct.

When the County objected to these instructions, the trial court cited *Ralph Pritts & Sons,*

*Inc. v. Butler*, 43 Md. App. 192, 197 (1979), a premises liability case holding an employer liable

for injuries to the customer of an off-duty employee operating an after-hours repair business.

The County argues that *Ralph Pritts* is inapposite because in that case, "the general manager had

been apprised of what the employee was doing in terms of servicing clients after hours and

---

(…continued)

> Consent by the principal may be inferred by words or conduct, including acquiescence.  While the agent does not necessarily have to communicate consent to the principal, the agent must in fact consent.

*          *          *          *

 b. Apparent Authority

A person or institution is responsible as a principal to third parties when:

(1) that person or institution leads a third party to believe that another is an agent; and

(2) the third party reasonably relies upon the agency.

being compensated for the auto repair work and did not object. Moreover, this practice had occurred in the past and was never prohibited."

We are not persuaded that the trial court erred in considering *Ralph Pritts* as support for these pattern agency instructions. Here, as in *Ralph Pritts*, the employee was not merely engaged in off-duty employment that resulted in the plaintiff's injury, but he was using "tools of the trade" knowingly supplied by the employer (i.e., training in crowd management and physical restraint), to earn his extra-duty compensation. Although Richardson's extra-duty work was not tacitly pre-authorized, as it was in *Ralph Pritts*, there was evidence from which the jury could infer that it was tacitly ratified *post hoc*, as suggested by the arrival of a supervising officer to meet with the Moraleses, the order returning Richardson to full duty the same day, the preparation of both a use of force report and an application for charges, and the filing of charges against Morales. *See* MPJI-Civ. 3:6 ("The employer or principal is responsible for the acts of the employee or agent that are beyond the extent of the employee's employment or the agent's authority if the employer or principal knows of the unauthorized acts and ratifies or adopts them. Ratification or adoption may come about by express acceptance or it may exist by reason of conduct which can include silence or failure to object when advised.").

Moreover, these agency instructions provided important context for the critical disputes over how the altercation began and whether Richardson was taking police action within the scope of his PGPD employment. Morales testified that after seeing Richardson's police badge and attire, he asked for Richardson's help in the belief that a police officer could and would

protect him from the physical threat posed by the agitated crowd. Richardson testified that after he refused to help Morales get inside the warehouse, Morales made contact with him in a manner that Richardson, who was armed with his police service weapon, felt warranted physical detention of Morales using a series of police-trained techniques. The jury benefitted from hearing that, in determining whether Richardson was acting within the scope of his employment, it could consider Richardson's apparent authority to act as a police officer notwithstanding the undisclosed restriction on his extra-duty work based on his light duty status. Similarly, the "economic benefit" portion of the challenged instruction was relevant in evaluating the fact that Richardson was paid solely by the fraternity for his work at the party and in considering the County's arguments that it received no benefit from Richardson's actions.

### "24/7 Policy" Instruction

The County also contends that the trial court erred in giving the following instruction pertaining to Richardson's duties as a police officer:

> You are instructed that Officer Richardson was a sworn Prince George's County police officer at the time of the incident at issue in this case. In Prince George's County, police officers are always considered to be "on duty," although periodically they are relieved of their routine duties. While within Prince George's County, PGCPD police officers are required at all times, when apart from their own homes, to be armed, unless the carrying of firearms is specifically prohibited. A PGCPD officer must also carry his badge at all times when away from home. Prince George's County police officers are at all times subject to orders from the proper authorities and to calls by citizens. Therefore, the fact that Officer Richardson may have been "off duty" at the time of the incident did not relieve him from the responsibility of taking proper police action in any matter coming to his attention that required such action.

> The County contends, that this instruction does not apply to this case, because

"Richardson was not only off duty on the date of this incident but he also was on light duty status and, as such, he was specifically prohibited from working secondary employment and taking police action." In the County's view, "[t]he court erred as a matter of law when it gave this jury instruction because it implied that Richardson was off duty, but was nevertheless authorized to take official police action."

The instruction is a correct statement of the law. As Morales points out, it is taken from the County's 24/7 Policy, providing that Prince George's County police officers are deemed on duty and are to be armed at all times while in public within the County, so that they may take police action when a citizen requests or circumstances warrant. *See* PGC Code, § 18-163(a & b), *supra* ("Sworn police officers are . . . always on duty, although periodically relieved from the routine performance thereof," so that they are "subject at all times to . . . call by citizens" and "[t]he fact that they may be off duty shall not be held as relieving them from the responsibility of taking proper police action in any matter coming to their attention requiring such action."). The County's argument against this instruction "piggybacks" on its previous contentions regarding the scope of Richardson's PGPD employment. For the same reasons the evidence was sufficient to generate a jury issue on that question, the evidence warranted this jury instruction. The trial court did not err in giving it.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

IN THE COURT OF SPECIAL APPEALS OF MARYLAND

PRINCE GEORGE'S COUNTY, MARYLAND, et al.

    Appellant

v.

STEVEN MORALES

    Appellee

No. 1308
September Term 2014

**APPELLEE STEVEN MORALES' REQUEST TO DESIGNATE
COURT'S OPINION FOR REPORTING**

    Appellee, Steven Morales, pursuant to Maryland Rule 8-605.1, requests this Court to designate for reporting the opinion of this Court filed September 8, 2016.

    The grounds for this request is that the opinion is of substantial interest as precedent. In this case, the Court found that a police officer who worked secondary employment against his employer's general orders but performed police-related duties acted within the scope of his employment for his governmental employer. Since the decision of the Court of Appeals of Maryland in *Lovelace v. Anderson*, 366 Md. 690, 717 (2001), which recognized that "a person performing a given function simultaneously may be the employee of two employers," trial courts have dealt with tort lawsuits arising from injuries caused by a police officer working for a private employer. *See, e.g., Espina v. Prince George's County*, 215 Md. App. 611 (2014), *aff'd on other grounds*, 442 Md. 311 (2015). From counsel's experience in handling many cases against police officers and their employers, it is not an uncommon scenario. However, few such cases exist at the appellate level with respect to the issue whether the off-duty officer acted within the scope of his governmental employment at the time of the occurrence. *See, Rusnack v. Giant Foods*, 26 Md. App. 250 (1975)(dealing with whether off-duty police officer

acted within the scope of his employment for Giant Food when he tortiously injured a patron at another Giant Foods store where he was not assigned to work). *See also*, the cases cited in the Court's opinion, at page 26, footnote 4. Significantly, this Court's opinion noted: "We have found no reported Maryland cases resolving a comparable scope of employment issue stemming from tortious conduct committed by an off-duty police officer working as a private security officer in violation of a police department's directive." Opinion, p. 22. Since this case deals with such an issue, it would serve as an important legal precedent if the opinion was reported. For this reason, and because the Court's opinion gives a thorough legal analysis of the scope of employment issue, the opinion of this Court should be designated for reporting.

Terrell N. Roberts, III
6801 Kenilworth Avenue
Suite 202
Riverdale, Maryland 20737
(301) 699-0764

## CERTIFICATE OF SERVICE

A copy of the foregoing was mailed this 13th day of September, 2016 to:

Tonia Y. Belton-Gofreed-BE1702
Associate County Attorney
The Prince George's County Office of Law
Attorney for Appellant Prince George's County Maryland
14741 Governor Oden Bowie Drive, Suite 5121
Upper Marlboro, Maryland 20772

Terrell N. Roberts, III
Attorney for Plaintiff