*Baltimore City Police Department v. David Esteppe, et al.*, No. 3128, September Term, 2018.  Opinion by Fader, C.J.

**LOCAL GOVERNMENT TORT CLAIMS ACT — SCOPE OF EMPLOYMENT — PROCEEDINGS TO ESTABLISH LIABILITY OF LOCAL GOVERNMENT TO PAY JUDGMENT**

A plaintiff who seeks to establish a local government's liability under the LGTCA for a judgment entered against its employee must initiate a proceeding that (1) joins the local government entity as a party and (2) offers the parties an opportunity to litigate whether the tortfeasor employee committed the relevant tort while acting within the scope of employment.  A plaintiff may initiate such a proceeding either within the underlying tort action or as a separate action.

**LOCAL GOVERNMENT TORT CLAIMS ACT — SCOPE OF EMPLOYMENT — ACTIONS BY LAW ENFORCEMENT OFFICERS**

The circuit court erred in concluding that police officer's conduct fell within the scope of that officer's employment as a matter of law where the record (1) contained evidence that the officer's conduct was motivated by personal reasons, and (2) is devoid of any factual support for the contention that the officer acted, even in part, in furtherance of the police department's interests.

Circuit Court for Baltimore City
Case No. 24-C-13-001297

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3128

September Term, 2018

_____

BALTIMORE CITY POLICE DEPARTMENT

v.

DAVID ESTEPPE, ET AL.

_____

Fader, C.J.,
Leahy,
Eyler, Deborah S.
     (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: August 27, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Appellee David Esteppe, the plaintiff below, obtained a judgment against appellee Adam Lewellen, the defendant below. Mr. Esteppe then sought to recover the judgment from the appellant, the Baltimore City Police Department (the "Department"), which is Mr. Lewellen's former employer. The Department's appeal raises two separate issues—one a matter of procedure and the other of substance—relating to a local government's liability under the Local Government Tort Claims Act ("LGTCA"), § 5-303 of the Courts & Judicial Proceedings Article (Repl. 2013; Supp. 2019).

First, the Department contends that the circuit court erred in ruling on the basis of the "Motion for Declaratory Relief to Enforce Judgment" Mr. Esteppe filed in the same action in which he obtained his judgment against Mr. Lewellen. We hold that a plaintiff who seeks to hold a local government liable under the LGTCA for a judgment entered against its employee must initiate a proceeding that (1) joins the local government entity as a party and (2) offers the parties an opportunity to litigate whether the tortfeasor employee committed the relevant tort while acting within the scope of employment. Here, although Mr. Esteppe did not formally join the Department as a party to the proceeding, the Department participated without objecting on that ground and, therefore, waived that objection. Accordingly, we conclude that the circuit court did not err procedurally in ruling on Mr. Esteppe's motion.

Second, the Department argues that the circuit court erred in determining that Mr. Lewellen acted within the scope of his employment when he engaged in the tortious conduct that gave rise to the judgment against him. That tortious conduct included submitting an affidavit in support of a search warrant for Mr. Esteppe's home in which

Mr. Lewellen falsely claimed that a confidential informant had purchased drugs from Mr. Esteppe. The Department first contends that serious criminal conduct can never fall within the scope of an officer's employment. The Court of Appeals recently rejected that argument in *Baltimore City Police Department v. Potts*, 468 Md. 265, 274, 305-06 (2020).[1] The Department also contends that even if serious criminal conduct can fall within the scope of an officer's employment, the circuit court erred as a matter of law in concluding that it did based on the record in this case. We agree with the Department that the record is devoid of any factual support for Mr. Esteppe's present contention that Mr. Lewellen's perjury was committed, even in part, in furtherance of the Department's interests. Accordingly, we will reverse the circuit court's judgment and remand for further proceedings.

## BACKGROUND

### *The Underlying Criminal Case*

In early 2012, Mr. Esteppe ended a romantic relationship with Brandi Chelchowski that had begun in late 2011. Subsequently, Ms. Chelchowski stalked and threatened Mr. Esteppe, called and texted him dozens of times each day, and, he suspected, damaged his vehicle. Mr. Esteppe changed his phone number and sought multiple peace orders. In March 2012, Ms. Chelchowski threatened Mr. Esteppe to the effect that she had "cop friends" and that he was "going down." Mr. Lewellen was one such "close" friend, whom Ms. Chelchowski had known "for years."

---

[1] We stayed this case pending the outcome of the Court of Appeals's decision in *Potts*.

2

On March 19, Ms. Chelchowski "said something to the effect of, 'You're going down next week.'" Eight days later, on March 27, then-Officer Lewellen applied for a warrant to search Mr. Esteppe's home on the pretext that Mr. Esteppe was a drug dealer. In the affidavit supporting the warrant application, Mr. Lewellen stated, among other things, that he recently had orchestrated a controlled purchase in which Mr. Esteppe sold drugs to a confidential informant. Specifically, Mr. Lewellen averred that he had the confidential informant set up the buy via telephone, searched the confidential informant to ensure that he was "free of any contraband," dropped off the informant at Mr. Esteppe's residence, and "took a covert position with a clear and unobstructed view of" the location as the confidential informant "approached the door and knocked." Then, according to Mr. Lewellen's affidavit:

> The front door opened, and I observed a white male whom I recognized to be David Esteppe . . . . [The confidential informant] entered the location and the door closed behind [him]. About 2 minutes later [the confidential informant] exited the location and met me nearby at a predetermined location.
>
> [The confidential informant] then provided me with 1 green ziplock bag containing a white powder substance, suspected cocaine. I then searched [the confidential informant] and [he] was found free of any other contraband.
>
> [The confidential informant] advised me upon entering the location [that the confidential informant] asked Mr. Esteppe if he could get "one," which is street terminology for one unit of cocaine. [The confidential informant] then gave Mr. Esteppe $20.00 in US Currency and Mr. Esteppe provided [the confidential informant] with 1 green ziplock bag containing a white powder substance.

In what appears to be a boilerplate portion of the affidavit, Mr. Lewellen identified a number of things that, in his experience, drug dealers commonly keep in connection with

3

their trafficking activities, including "large amounts of . . . currency"; "paraphernalia used in the manufacture, packaging, preparation, and weighing of [controlled dangerous substances] in preparation for trafficking"; "firearms and ammunition"; "financial records and financial instruments"; "records of their drug transactions"; "books, records and other documents that identify" the names of associates; telephones and pagers; photographs and videos of themselves and their associates; "identification and travel documents"; and vehicles. The search warrant application sought permission to seize any of those items, as well as any illegal drugs.

Based on Mr. Lewellen's affidavit, the court issued a warrant authorizing the search of Mr. Esteppe's home and seizure of items found there. Later that day, Mr. Lewellen and several other officers "busted in" through Mr. Esteppe's front door and executed the search warrant. During the search, the officers repeatedly accused Mr. Esteppe of being a drug dealer and asked him to identify the location of the drugs in his home. The officers did not uncover any illegal drugs. They did, however, find and seize a black powder rifle and a shotgun that Mr. Esteppe kept for hunting. Mr. Esteppe was arrested and charged for unlawful possession of a firearm based on a relatively new law—of which Mr. Esteppe had been unaware—that disqualified him from possessing firearms.[2] When he was arrested, Mr. Esteppe heard Mr. Lewellen say that "Brand[i] led us to it."

---

[2] Mr. Esteppe was convicted of assault in 2008, a fact that Mr. Lewellen listed under the "Criminal History" section of his warrant application. Unknown to Mr. Esteppe at the time, just months before his arrest the General Assembly had made it illegal for anyone convicted of a crime of violence to possess a rifle or shotgun. *See* 2011 Md. Laws, ch. 164, *codified at* Md. Code Ann., Pub. Safety § 5-206 (Repl. 2018; Supp. 2019).

After his arrest and release awaiting trial, Mr. Esteppe, along with other witnesses, informed the Department of their suspicions that he may have been set up. The Department's Internal Affairs Division began an investigation, during which the confidential informant listed in the warrant application stated that he had never seen or met Mr. Esteppe, nor had he ever set foot in Mr. Esteppe's house or called him on the phone. Investigators obtained phone records for the confidential informant and Mr. Esteppe, which verified that the two had not had any phone contact.

After he was interviewed for the investigation, the confidential informant contacted Mr. Lewellen, who met with the confidential informant and pressured him to recant the information he had provided to the investigators. Mr. Lewellen had the informant call the investigators over speakerphone in Mr. Lewellen's presence and "direct[ed] him what to say." The informant complied at the time, but then subsequently reported that interaction to the Internal Affairs investigators.

Subsequently, the State entered a *nolle prosequi* in the criminal case against Mr. Esteppe, thereby dropping all charges.

In two separate charging documents, the State charged Mr. Lewellen with perjury as to the affidavit, misconduct in office, and obstruction, among other crimes. He pleaded guilty to perjury and misconduct in office, and resigned from the Department as part of his plea deal. At the plea hearing, the prosecutor recited a statement of facts to which Mr. Lewellen agreed, with no modifications or objections. The statement included, among other things, that Mr. Lewellen had been "close" friends with Ms. Chelchowski "for years"; the affidavit he had submitted in support of the warrant application was "bogus,"

5

"fraudulent," and "perjurious"; he "was the lead on th[e] execution of that search warrant"; and he had directed the confidential informant "to recant what he told Internal Affairs."

*The Civil Action*

In March 2013, Mr. Esteppe filed a complaint for damages against Mr. Lewellen, the Department, the Mayor and City Council of Baltimore (the "City"), and the State of Maryland. Mr. Esteppe brought counts for assault, battery, false arrest, false imprisonment, intentional infliction of emotional distress, malicious prosecution, negligence, violations of the Maryland Declaration of Rights, and civil conspiracy. The circuit court dismissed the claims against all defendants but Mr. Lewellen.

In November 2014, the court held a bench trial. During his opening statement, counsel for Mr. Esteppe advanced his theory that Mr. Lewellen's actions were motivated not by malice toward Mr. Esteppe, but rather by Mr. Lewellen's "desire to please and remain in a relationship with Brand[i] Chelchowski." Counsel explained that "subsequent to Mr. Esteppe breaking up with Ms. Chelchowski, she got involved in a relationship with the Defendant, Adam Lewellen. And then she encouraged him – as we understand it – to basically bring down Mr. Esteppe. So, the motivation was to please her, and not to get Mr. Esteppe. That's our position."

Mr. Esteppe's case-in-chief consisted only of his testimony and the transcript of Mr. Lewellen's guilty plea, which the Court admitted as substantive evidence.[3] After

---

[3] At the time, § 9-104 of the Courts and Judicial Proceedings Article rendered Mr. Lewellen incompetent to testify as a result of his perjury conviction. *See* Md. Code Ann., Cts. & Jud. Proc. § 9-104 (Repl. 2013). In 2016, the General Assembly repealed § 9-104, and amended § 10-905 of the Courts Article to provide that "[e]vidence that a

6

hearing Mr. Esteppe's case-in-chief, the court granted Mr. Lewellen's motion for judgment regarding the counts of assault, battery, false arrest, false imprisonment, and malicious prosecution, as well as the request for punitive damages.[4] The court denied Mr. Lewellen's motion concerning the counts for intentional infliction of emotional distress, negligence, constitutional tort, and civil conspiracy.

During his closing argument, Mr. Esteppe's counsel argued that Mr. Lewellen's "conduct was intentional" and his purpose singular:

> As a matter of fact, that was why he did it. He knew, he knew that this woman – who he knew, he was friends with – had broken up with David Esteppe, and . . . in fact, what maybe she knew or didn't know at that time was that Lewellen was trying to make headway with her. So, for all of the wrong motives, he was using his power – he was abusing his authority – to try to cause pain, which he succeeded in doing to someone else. . . . [H]is real motive was the intentional infliction of emotional distress.

On rebuttal closing, Mr. Esteppe's counsel returned to the same theme:

> Mr. Lewellen[] entered into an illegal agreement with this woman who was the former girlfriend of Mr. Esteppe—and whom he was trying to court to become his girlfriend . . . .

> He wanted to get in tight with her – he, through his agreement with her, led to conduct on his part that he was so, so trying to impress her that he was willing to put his career on the line. And in fact, he did put his career on the line, and destroyed it by going to a judge and lying under oath . . . .

_____

witness has been convicted of perjury shall be admitted for the purpose of attacking the credibility of the witness." *See* 2016 Md. Laws, ch. 530.

[4] At the outset of the trial, Mr. Esteppe abandoned his request for punitive damages, although the court later stated that it would have awarded them. The court entered judgment in favor of Mr. Lewellen on the assault, battery, and malicious prosecution counts because Mr. Esteppe disclaimed any malice on Mr. Lewellen's part. The court also entered judgment for Mr. Lewellen on the malicious prosecution count, as well as the false arrest and false imprisonment counts, for the separate reason there was a legal basis to arrest and prosecute Mr. Esteppe after the police found the firearms he unlawfully possessed.

After closing arguments, the trial court ruled in favor of Mr. Lewellen on the intentional infliction of emotional distress count because the court was "not convinced by a preponderance of the evidence" that Mr. Esteppe's embarrassment and humiliation were sufficiently "severe" and "extreme." The court then found in favor of Mr. Esteppe on all three of his remaining claims and awarded him $166,007.67 in damages.

This Court affirmed in an unreported opinion. *See Lewellen v. Esteppe*, No. 2009, Sept. Term 2014, 2015 WL 7941110 (Dec. 4, 2015). Among other rulings, this Court held that the circuit court had properly admitted and considered the statement of facts from Mr. Lewellen's plea agreement as substantive evidence, *id.* at *6-*11, and that sufficient evidence supported the court's ruling that Mr. Lewellen and Ms. Chelchowski had engaged in a civil conspiracy, with Mr. Lewellen's act of perjury "committed in furtherance of that agreement," *id.* at *16. We stated:

> The evidence before the circuit court indicated that Ms. Chelchowski and [Mr. Esteppe] had been in a relationship, that Ms. Chelchowski was angered when [Mr. Esteppe] ended that relationship, that Ms. Chelchowski threatened [Mr. Esteppe] by telling him that "I have cop friends and you're going down," that Ms. Chelchowski told [Mr. Esteppe] that he was "going down next week" on March 19, 2012 – approximately one week before [Mr. Esteppe] had been surprised by police at his house, and that [Mr. Lewellen] told [Mr. Esteppe] while searching his house that "Brandi led us to it." In light of this evidence, the court was justified in circumstantially finding an agreement between Ms. Chelchowski and [Mr. Lewellen], and [Mr. Lewellen]'s fraudulent application for the search warrant was surely an act committed in furtherance of that agreement.

*Id.*

8

### *Mr. Esteppe's Attempt to Enforce the Judgment Against the Department*

In April 2016, Mr. Esteppe sent two letters requesting that the City pay the judgment entered against Mr. Lewellen.  The City refused, replying by letter that (1) because the City and the Department had been dismissed from the case, "the issue of whether Mr. Lewellen was acting within the scope of his employment was not, nor could it have been, adjudicated" in the underlying case, and (2) the LGTCA did not obligate the City or the Department to pay the judgment because Mr. Lewellen was not acting within the scope of his employment when he "obtain[ed] the perjured warrant against Mr. Esteppe . . . for personal reasons having nothing to do with the lawful objectives of the [Department]."

Mr. Esteppe then filed a "Motion for Declaratory Relief to Enforce Judgment" against both the Department and the City.  Mr. Esteppe, who filed his motion in the same civil case in which he had obtained his judgment against Mr. Lewellen, sought "a written declaration specifying that (a) Mr. Lewellen's conduct, on which the underlying tort judgment was based, occurred in the scope of Mr. Lewellen's employment, and (b) that the City and the Department are required to pay the judgment that Mr. Esteppe obtained against Mr. Lewellen."  Mr. Esteppe argued that "[t]he City and the Department [we]re necessary parties" at that juncture of the proceedings based on their "interest in the declaratory relief sought."  Therefore, he contended, their prior dismissal from the case "ha[d] no effect on [their] responsibility to comply with the LGTCA at the post-judgment stage" or their obligation "to pay judgments against their employees."

Mr. Esteppe also argued that "Mr. Lewellen's criminal conduct, though not expressly authorized by the [City and the Department], was within the scope of [his]

9

employment." Specifically, Mr. Esteppe contended that Mr. Lewellen's conduct had involved routine police work—investigating potential crime, swearing out an affidavit, executing a warrant, and making an arrest—that benefited his employer, and thus was within the scope of his employment, notwithstanding any mixed or entirely improper motive. The motion relied entirely on the record developed in Mr. Esteppe's case against Mr. Lewellen; Mr. Esteppe sought no new discovery, nor did he add to the evidentiary record. According to the certificate of service attached to his motion, Mr. Esteppe served the motion personally on the City Solicitor and the Department's chief solicitor.

The Department filed a written response in opposition to Mr. Esteppe's motion in which it argued that he lacked standing to seek indemnification from the Department, that the Department had sovereign immunity from his claim, and that Mr. Lewellen had acted outside the scope of his employment. The Department did not request discovery, nor did it seek to introduce any new evidence in opposition to Mr. Esteppe's motion. Instead, for its factual defense based on scope of employment, the Department's responsive brief relied exclusively on the transcript from Mr. Lewellen's guilty plea hearing and the judgment against Mr. Lewellen for conspiring with Ms. Chelchowski. Notably, the Department did not assert a defense based on Mr. Esteppe's failure to join it as a party.

The City separately opposed Mr. Lewellen's motion. Unlike the Department, the City *did* argue that Mr. Esteppe's motion was improperly filed against it, as a non-party. The City also argued that: (1) Mr. Esteppe lacked any right of enforcement against the

10

City, which was not Mr. Lewellen's employer;[5] (2) Mr. Lewellen had acted outside the scope of his employment; and (3) Mr. Lewellen had acted with malice.

Mr. Esteppe's motion for declaratory relief to enforce the judgment was heard by a different judge than the trial judge. At oral argument on his motion—in stark contrast to his arguments during his case against Mr. Lewellen—Mr. Esteppe argued that the Department was "asking us to assume facts that aren't here, namely that [Mr. Lewellen] did this solely to please the woman." According to Mr. Esteppe, the record contained only "innuendo" and "speculation" that Mr. Lewellen had acted to please Ms. Chelchowski.[6] Mr. Esteppe contended that Mr. Lewellen had acted within the scope of his employment because it was undisputed that, at the time of Mr. Lewellen's tortious conduct, he "was working," had obtained a search and seizure warrant, and "went through the ministerial duties of filling out the probable cause statement and filling out the affidavit and going to [the issuing judge]." In other words, Mr. Esteppe argued, Mr. Lewellen was "doing things that police officers do."

---

[5] Unlike other local police departments in Maryland, the Department "was created as a state agency, through an act of the General Assembly, and not as a municipal agency." *Houghton v. Forrest*, 412 Md. 578, 588 (2010). Thus, the City is "not . . . the employer of members of the [Department] for purposes of tort liability." *Id.* at 588-89 (quoting *Clea v. Mayor & City Council of Baltimore*, 312 Md. 662, 668 (1988), *superseded by statute on other grounds as stated in Houghton*, 412 Md. at 589).

[6] In its opposition to Mr. Esteppe's motion, the Department cited *Vogel v. Touhey*, 151 Md. App. 682, 718-19 (2003), for the proposition that "Mr. Esteppe is judicially estopped from contesting any of the facts of this case or asserting any legal position . . . inconsistent" with those "he advanced in the earlier trial, and that were accepted by the trial court and this Court on appeal."

The motions judge took the matter under advisement. Nine months later, having not yet received a ruling, Mr. Esteppe filed a supplement to his motion to call the court's attention to two recently decided cases. Specifically, Mr. Esteppe averred that under *Johnson v. Mayor & City Council of Baltimore*, 233 Md. App. 43 (2017), (1) the Department "is the responsible 'local government' under the LGTCA when a judgment is rendered against a Baltimore City police officer"; and (2) "[w]hen the [Department] fails to pay a judgment for which it is responsible, the plaintiff may bring an enforcement proceeding to collect from the [Department]." Mr. Esteppe also argued that under *Prince George's County v. Morales*, 230 Md. App. 699 (2016), Mr. Lewellen's exertion of police authority put his conduct within the scope of his employment as a police officer. The Department filed an opposition to the supplement in which it argued that Mr. Esteppe's reliance on *Johnson* and *Morales* was misplaced.

In December 2018, the motions court issued a three-page memorandum and order in which it found that "[a]t the time of the tortious conduct, . . . Lewellen was clearly within his scope of employment." The court reasoned:

> Executing a search warrant to seize an illegal firearm is exactly the type of conduct for which Lewellen was employed. As the search was executed whilst Lewellen was on duty, and in a jurisdiction for which Lewellen had police powers, the conduct occurred in an authorized area. A primary goal of the [Department] in recent years is the seizure of illegal firearms and the arrest of those in possession of those weapons, and therefore the search, however motivated, furthered a purpose of Lewellen's master, the [Department].
>
> Indeed, when considering the issue at trial, [the trial judge] similarly concluded:

And it's undisputed that [Mr. Lewellen] was working.  It's undisputed that it was a search and seizure warrant.  It's undisputed that he went through the ministerial duties of filling out the probable cause statement, and filling out the Affidavit, and going to [the issuing judge].

Thus, the motions court held, "the [Department] is liable for the judgment held by Esteppe against Lewellen."[7]  The Department timely appealed.

## DISCUSSION[8]

Mr. Esteppe's motion was styled as a "Motion for Declaratory Relief to Enforce Judgment," which is not a permissible mechanism to raise a claim for declaratory relief.

---

[7] The circuit court denied Mr. Esteppe's motion as to the City.  Mr. Esteppe has not raised the denial of that motion on appeal, and so it is not before us.

[8] Before addressing the merits, we must first resolve a preliminary matter.  Although this is the Department's appeal, shortly before oral argument, the Department filed a Suggestion of Lack of Jurisdiction and Motion for Remand for Entry of Final Appealable Order.  The Department stated that it had discovered that the order granting Mr. Esteppe's motion for declaratory relief against the Department was not a final appealable order because (1) the court had not satisfied the separate document requirement of Rule 2-601 and (2) the docket entry did not identify the court's resolution of the motion as to the Department.  Although the Department's arguments might be better taken if they had been raised earlier, it waived this issue by affirmatively appealing the court's order and proceeding with the appeal without raising the issue until the eve of oral argument.  *See URS Corp. v. Fort Myer Constr.*, 452 Md. 48, 70 (2017) (holding that "the separate document requirement was waived" and this Court "had jurisdiction to consider the appeals" when "[n]o party objected to the absence of a separate document, . . . [t]he Circuit Court 'clearly intended [the docket entry] to be a final judgment,'" and remand would merely produce unnecessary delay (quoting *Suburban Hosp. v. Kirson*, 362 Md. 140, 156 (2000))); *see also Lee v. Lee*, 466 Md. 601, 631 n.9 (2020) ("Nothing in this opinion should be read to override case law on waiver of the separate document requirement." (citing *Fort Myer*, 452 Md. at 67-70)).  Remanding now on this basis would cause unnecessary delay in resolving this fully briefed appeal.  *See Fort Myer*, 452 Md. at 70 ("[R]emand[ing] to the Circuit Court . . . [to] simply file and enter the separate judgment, from which a timely appeal would then be taken[,] . . . would be a classic example of wheels spinning for no practical purpose.").  Instead, we will address the merits.  Moreover, if we thought it necessary for the circuit court to correct its order by issuing a separate declaratory

13

Mr. Esteppe's motion was more akin to a motion for summary judgment on the question of the Department's liability under the LGTCA to pay the judgment rendered against Mr. Lewellen. *See State Farm Mut. Auto Ins. v. Crisfulli*, 156 Md. App. 515, 520 (2004) ("The 'motion for declaratory judgment' . . . was not a separate declaratory judgment action; rather, it was a motion for partial summary judgment on the issue of liability in [plaintiff's] contract claim . . . ."); *Wittel v. Baker*, 10 Md. App. 531, 544 (1970) (where plaintiffs filed a "motion for declaratory relief pursuant to the Uniform Declaratory Judgments Act[,] . . . [t]he [circuit] court accepted the motion as an application to decide a question of law pursuant to Maryland Rule 502," the predecessor of Rule 2-502). "Accordingly, the issue that is before us on appeal is whether the court erred in granting summary judgment on [the Department's] liability." *Crisfulli*, 156 Md. App. at 521.

"An appellate court reviews without deference a trial court's grant of a motion for summary judgment, 'review[s] the record in the light most favorable to the nonmoving party[,] . . . and construe[s] any reasonable inferences that may be drawn from the facts against the moving party.'" *Baltimore City Police Dep't v. Potts*, 468 Md. 265, 282 (2020) (quoting *Kennedy Krieger Inst. v. Partlow*, 460 Md. 607, 632-33 (2018)). "Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and [ ] the [moving] party is entitled to judgment as a matter of law.'" *Potts*, 468 Md. at 282 (quoting Md. Rule 2-501(a)).

judgment, we could order it to do so after we decide the merits of this appeal. *See Md. Cas. Co. v. Hanson*, 169 Md. App. 484, 524-25 (2006).

"If there is a material factual dispute as to whether an employee's actions were taken within the scope of employment, the question is one of fact. If there is not, the question is one of law." *Clark v. Prince George's County*, 211 Md. App. 548, 570 (2013). "Even when the parties' versions of events are in conflict, however, if the facts adduced to show that the defendant was acting within the scope of his employment are not legally sufficient to support such a reasonable finding by the trier of fact, any dispute of fact is not material, as it will not affect the outcome of the case." *Id.* at 570-71. "Where there is no conflict in the evidence relating to the question [of whether an employee is acting within the scope of employment] and but one inference can be drawn therefrom, the question is one of law for the court." *Id.* at 571 (alteration in *Clark*) (quoting *Rusnack v. Giant Food*, 26 Md. App. 250, 265 (1975)); *see also Brown v. Mayor & City Council of Baltimore*, 167 Md. App. 306, 323 (2006) (noting that although "whether [the employee] was, in fact, acting within the scope of his employment . . . is ordinarily a question of fact for the fact-finder, when the facts are undisputed, it becomes a question of law"). We review "a trial court's determinations of legal questions or conclusions of law based on findings of fact" without deference. *L.W. Wolfe Enters. v. Md. Nat'l Golf*, 165 Md. App. 339, 344 (2005) (quoting *Ins. of N. Am. v. Miller*, 362 Md. 361, 372 (2001)).

## I. THE CIRCUIT COURT DID NOT ERR IN ADDRESSING THE MERITS OF MR. ESTEPPE'S MOTION.

The Department contends that Mr. Esteppe's "Motion for Declaratory Relief to Enforce Judgment" was procedurally improper and that Mr. Esteppe should instead have filed a separate action against the Department to enforce his judgment against

15

Mr. Lewellen. Mr. Esteppe responds that his motion served the same purpose as a separate action and is similar to the procedure mandated by the Court of Appeals to litigate a private insurer's coverage obligation following a tort suit. *See Allstate Ins. v. Atwood*, 319 Md. 247, 262, 265-66 (1990).

We agree in part, and disagree in part, with both parties. This Court recently has analyzed a tort victim's efforts to enforce a local government's obligation under the LGTCA in two different opinions issued in the same underlying case. First, in *Johnson v. Mayor & City Council of Baltimore*, 233 Md. App. 43 (2017) ("*Johnson II*"),[9] a tort victim who had prevailed in a suit for damages against three Department officers sought to execute the judgment against the City. *Id.* at 50. The trial court quashed the writs of execution, and we affirmed. *Id.* at 51, 57. In addition to pointing out deficiencies in the tort victim's collection efforts (which are not relevant here), we observed that "if the [Department] fails to pay a judgment for compensatory damages entered against one of its officers, 'it is subject to an enforcement action'" by the tort victim. *Id.* at 56 (quoting *Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 326 (2001)).

On remand, Mr. Johnson did not heed our suggestion. Instead, without filing a claim against the Department or otherwise seeking to join it as a party to the action—and notwithstanding that his only judgment was against the three officers—he propounded discovery in aid of enforcement directly to the Department. *Johnson v. Francis*, 239 Md.

---

[9] The same underlying case has led to three reported opinions from this Court. In *Francis v. Johnson*, 219 Md. App. 531 (2014) ("*Johnson I*"), we affirmed the underlying tort judgments against the three Department officers who were found liable for violating the tort victim's rights. *Johnson I* is not otherwise relevant here.

16

App. 530, 538 (2018) ("*Johnson III*"), *cert. denied*, 463 Md. 155 (2019). The circuit court quashed the discovery propounded to the non-party Department, and Mr. Johnson again appealed. *Id.* at 538-39. In affirming, we held that before engaging in collection activity against a local government under the LGTCA, a tort victim must first establish the local government's liability. *Id.* at 542-48. Doing so, we held, requires the tort victim to prove that the tortfeasor employee had acted within the scope of employment when committing the tort. *Id.* at 547-48. We observed that in some cases, scope of employment can be resolved without filing a new action, particularly when the parties "stipulat[e] that the officer [] acted within the scope of employment," *id.* at 547 (discussing *Espina v. Jackson*, 442 Md. 311, 347 (2015)), or otherwise leave the issue "not really in dispute," *Johnson III*, 239 Md. at 547 (discussing *Houghton v. Forrest*, 412 Md. 578, 592 (2010)). But conversely, when "the scope-of-employment question [] is not settled or sufficiently obvious that we can resolve it as a matter of law, . . . [i]t is the plaintiff's burden to establish its right to collect from the Department, either through an enforcement action or some other permissible mechanism." *Johnson III*, 239 Md. App. at 548.

We did not expound on what "some other permissible mechanism" would look like in *Johnson III*, because that question was not before us.[10] We did, however, give some indication as to what would be necessary:

---

[10] In dicta, to provide guidance for the circuit court on remand, we also addressed the Department's contention that a tort victim may not seek payment of a judgment directly from a local government under the LGTCA unless it first receives an express assignment of the tortfeasor employee's claim to indemnification from the local government. *Id.* at 549. We rejected that argument based on the plain language of the LGTCA, which makes a local government "'liable for any judgment against its employee[s]' . . . [p]rovided the

17

[W]here a money judgment is entered against an employee of a local government arising from tortious acts or omissions committed by the employee:

- The local government is liable to the plaintiff for the amount of the judgment, up to the limits provided in § 5-303(a)(1) [of the Courts Article], if and only if the employee was acting within the scope of [] employment with the local government; and

- A plaintiff who obtains a judgment against a local government's employee can establish the local government's liability by filing an enforcement action against the local government. In such a proceeding, the local government can raise as a defense that the employee was not acting within the scope of [] employment.

Of course, as set forth above, in this case the parties are not all the way there yet. Although we are able in appropriate cases to assess whether an officer acted within the scope of employment as a matter of law based on undisputed facts in the record, *Houghton*, 412 Md. at 592; *Brown*, 167 Md. App. at 326, or based on a stipulation, *Espina*, 442 Md. at 347, the record and briefing here are not sufficient for us to do so. It may be that all of the evidence necessary to make that determination was presented at the original trial and already exists, or it may be that further evidentiary proceedings are necessary. If an enforcement action is filed, that determination will need to be made by the circuit court.

*Id.* at 555-56.

Both the Department and Mr. Esteppe claim support from our opinions in *Johnson II* and *III*. Mr. Esteppe contends that his "motion for declaratory relief" was a "permissible mechanism" to pursue his claim directly against the Department. The Department disagrees and argues that a separate enforcement action was required. This case thus requires us to carry forward our analysis from the *Johnson* opinions to identify how a tort

employees acted within the scope of their employment." *Id.* at 550 (quoting Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1)). In its opposition to Mr. Esteppe's motion for declaratory relief—which was filed before our decision in *Johnson III*—the Department made the same argument. The Department has not pursued that argument in this appeal.

victim may seek to enforce a claim against a local government under the LGTCA to pay a judgment awarded against a tortfeasor employee.

As we observed in *Johnson III*, there is not always a genuine dispute regarding whether a tortfeasor employee's tortious actions were undertaken within the scope of employment. In some cases, such as *Houghton*, that issue can be readily settled by undisputed facts in the record of the underlying case. 412 Md. at 592. In others, such as *Espina*, it may already have been settled by the local government's stipulation.[11] 442 Md. at 347. In those cases, we would expect that the local government will pay the judgment without the need for any further litigation.

Where there is a genuine dispute, however, the plaintiff bears the burden to "establish the local government's liability." *Johnson III*, 239 Md. App. at 555. Here, the parties raise two different questions regarding *how* a tort victim may do so: (1) What type of proceeding is required? and (2) May such a proceeding be brought as part of the underlying tort action, or must it be filed as a separate action?

---

[11] A stipulation binds the local government only if, as in *Espina*, the local government was a party to the stipulation. Stipulations as to scope of employment entered by a tort victim and tortfeasor employee cannot bind the local government absent its assent to the stipulation. Under the LGTCA, it is nearly always to the benefit of both the tort plaintiff and the tortfeasor employee to agree that the employee was acting within the scope of employment. Such a finding does not disadvantage either party and, if ultimately established, provides: (1) the tort plaintiff with a deep pocket from which to recover; and (2) immunity from the judgment for the tortfeasor employee, unless he or she is found to have acted with malice. *See Johnson III*, 239 Md. App. at 552-53 (Under the LGTCA, where an employee is found to have acted without malice, "only the local government is liable to pay the judgment." If the employee is found to have acted with malice, both the employee and the local government are liable. (citing Cts. & Jud. Proc. § 5-302(b)(1))).

19

### A.	A Tort Victim May Establish the Local Government's Liability to Pay a Judgment Under the LGTCA by Filing an Action Against the Local Government to Resolve the Scope of Employment Issue.

As we explained in *Johnson II* and *Johnson III*—and, indeed, as we earlier suggested in *Baltimore Police Department v. Cherkes*, 140 Md. App. 282, 326 (2001)—a tort victim may file "an enforcement action" against a local government to compel it to pay a judgment awarded against its tortfeasor employee. In such an action, the tort victim seeks a judgment against the local government for payment of the underlying judgment against the tortfeasor employee.

Mr. Esteppe contends that a declaratory judgment proceeding is also a permissible mechanism for settling the disputed issue of the local government's liability. A declaratory judgment proceeding "is a vehicle by which a person may obtain a judicial declaration to 'afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.'" *Hanover Invs. v. Volkman*, 455 Md. 1, 15 (2017) (quoting Md. Code Ann., Cts. & Jud. Proc. § 3-402). Under § 3-409(a) of the Courts Article,

> a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:
>
> > (1) An actual controversy exists between contending parties;
> >
> > (2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or
> >
> > (3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

In other words, "[t]he 'uncertainty or controversy[]' . . . must be justiciable." *Volkman*, 455 Md. at 15.

20

Importantly, "[a] party may obtain a declaratory judgment or decree notwithstanding a concurrent common-law, equitable, or extraordinary legal remedy, whether or not recognized or regulated by statute." Cts. & Jud. Proc. § 3-409(c); *see also id.* § 3-403(a) ("Except for the District Court, a court of record within its jurisdiction may declare rights, status, and other legal relations whether or not further relief is or could be claimed. An action or proceeding is not open to objection on the ground that a declaratory judgment or decree is prayed for."). "[T]he General Assembly added this proviso to the Declaratory Judgments Act to make clear that a party is not precluded from seeking declaratory relief simply because that party has the option of pursuing some other remedy." *Volkman*, 455 Md. at 16. Thus, "[t]he existence of other potential causes of action or remedies is not a bar to pursuit of a declaratory judgment."[12] *Id.*; *see also Allied Inv. Corp. v. Jasen*, 354 Md. 547, 556-57 (1999) ("That a separate claim exists upon which suit could be brought . . . ordinarily does not defeat a party's right to seek and obtain a declaratory judgment prior to filing the other claim."); *Post v. Bregman*, 349 Md. 142, 160 (1998) (We have not . . . generally blessed the dismissal of a proper action for declaratory judgment because of a ruling on an alternative claim in the same action."). Therefore, the availability of an enforcement action to pursue a claim against a local government is not a bar to seeking declaratory relief.

---

[12] It would, of course, be improper to "entertain an action for declaratory relief . . . when there is already a pending action 'involving the same parties and in which the identical issues that are involved in the declaratory action may be adjudicated.'" *Volkman*, 455 Md. at 17 (quoting *Sprenger v. Pub. Serv. Comm'n*, 400 Md. 1, 26 (2007)); *Waicker v. Colbert*, 347 Md. 108, 113 (1997) (same). But that is not the case here: the Department's liability was not before the court in the underlying civil action against Mr. Lewellen.

21

Regardless of whether a tort victim seeks to establish a local government's obligation to pay an underlying judgment through an enforcement action, a declaratory judgment action, or a combination of the two, however, any such action must be brought directly "against the local government." *Johnson III*, 239 Md. App. at 555. At that point, the tort victim's claim is no longer against the tortfeasor employee for the underlying tort, but against the local government he or she contends has become liable to pay the judgment under the LGTCA. That local government must, therefore, be made a party and given the opportunity to be heard.[13] *See* Md. Rule 2-101(a) ("A civil action is commenced by filing a complaint with a court."); Md. Rule 2-211(a) (requiring joinder of "a person who is subject to service of process . . . if in the person's absence (1) complete relief cannot be accorded among those already parties, or (2) disposition of the action may impair or impede the person's ability to protect a claimed interest relating to the subject of the action . . . .");

---

[13] In addition to the practical aim of judicial economy, the primary purpose of our joinder rules is "to assure that a person's rights are not adjudicated unless that person has had his 'day in court.'" *See Serv. Transp. v. Hurricane Express*, 185 Md. App. 25, 39 (2009) (quoting *Mahan v. Mahan*, 320 Md. 262, 272 (1990)). That "day in court"—i.e., a person's "opportunity to be heard"—is a "fundamental requisite of due process of law." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). Indeed, "there can be no doubt that at a minimum [the Due Process Clause] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Canaj, Inc. v. Baker & Div. Phase III, LLC*, 391 Md. 374, 424 (2006) (alterations in *Canaj*) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)); *see also, e.g.*, *Superior Court v. Ricketts*, 153 Md. App. 281, 336-37 (2003) (citing cases for the proposition "that procedural due process requires that litigants must receive notice, and an opportunity to be heard" (quoting *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 81 (2001))). "It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefor[e] has never had an opportunity to be heard." *Bryan v. State Farm Mut. Auto. Ins.*, 205 Md. App. 587, 606 (2012) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979)).

*see also* Cts. & Jud. Proc. § 3-405(a)(1) ("If declaratory relief is sought, a person who has or claims any interest which would be affected by the declaration, shall be made a party."); *Serv. Transp.*, 185 Md. App. at 37-38 ("[T]here is no difference in a necessary parties analysis whether the Declaratory Judgment Act or Md. Rule 2-211 is invoked." (citing *Gardner v. Bd. of County Comm'rs*, 320 Md. 63, 76 (1990))).

As we observed in *Johnson III*, resolving the scope of employment issue will not necessarily require the parties to take discovery and present new evidence. 239 Md. App. at 555-56. "It may be that all of the evidence necessary to make that determination was presented at the original trial and already exists," *id.* at 556, in which case the parties may choose to rely partially or entirely on that existing record. But a local government must have the opportunity to present an evidentiary defense if it seeks, in good faith, to present one. *See id.*; *cf. Brown*, 167 Md. App. at 320-21 (stating, in collateral estoppel context, that the City and the Department "had no 'full and fair opportunity' to litigate the scope of employment issue" in the underlying wrongful death case because "[t]hey had been dismissed from that case on other grounds"). Similarly, of course, the tort victim should also have the opportunity to present evidence relevant to that issue. And, to the extent either side invokes the right, "the issue of whether a servant is acting within the scope of his employment is ordinarily a question for the jury[.]" *Prince George's County v. Morales*, 230 Md. App. 699, 716 (2016) (quoting *Cox v. Prince George's County*, 296 Md. 162, 170 (1983)); *see also* Cts. & Jud. Proc. § 3-404 ("The fact that a proceeding is brought under [the Declaratory Judgment] subtitle does not affect a right to jury trial which otherwise may exist.").

**B.** **An Action to Enforce a Local Government's Obligation to Pay a Judgment Under the LGTCA May Be Filed as a Separate Action or Within the Underlying Tort Action.**

Identifying a requirement to file a claim for recovery "against the local government" does not resolve whether such a claim must be filed as a separate action or instead may be filed within the underlying tort action. Relying on the Court of Appeals's decision in *Allstate Insurance v. Atwood*, 319 Md. 247 (1990), Mr. Esteppe contends that there is precedent for allowing such a proceeding to be brought within the underlying tort action in what he deems the analogous circumstance of establishing an insurer's obligation to pay a tort judgment awarded against its insured. We agree that the situations are partially analogous, although differences between a local government's obligation under the LGTCA and a private insurer's contractual obligation cause us to conclude that such an action against a local government also may be brought as a separate action.

The question answered in *Atwood* arose from the decision of the Court of Appeals 15 years earlier in *Brohawn v. Transamerica Insurance*, 276 Md. 396 (1975). In *Brohawn*, the Court held "that an insurer, prior to trial of a tort suit against its insured, ordinarily could not obtain a declaratory judgment concerning policy coverage, where the coverage issue was essentially the same as an issue to be decided in the pending tort case." *See Atwood*, 319 Md. at 249 (describing holding in *Brohawn*). The insurer's incentive in such circumstances is to prove that its insured acted intentionally—and thus is excluded from coverage under the policy—which creates a conflict of interest with its insured. *See Brohawn*, 276 Md. at 409. Permitting the insurer to litigate that issue before resolution of

24

the underlying tort suit would be contrary to the interests of the insured, and, therefore, would violate its duties to its policyholder. *See id.* at 405-06, 409.

*Brohawn* left unanswered when and how an insurer laboring under such a conflict of interest could litigate its coverage defense. Those questions were resolved by *Atwood*. There, the insurer filed a separate declaratory judgment action following the tort verdict, naming its insured (the tortfeasor) and the tort victim as defendants. 319 Md. at 250. The insurer sought a declaration that an exclusion in its policy precluded coverage. *Id.* On appeal, this Court upheld the circuit court's dismissal of the declaratory judgment action and held that the insurer should instead have intervened in the underlying tort suit to press its coverage defense. *Id.* at 251.

The Court of Appeals reversed. *Id.* at 255-63. In doing so, the Court explained that "in the conflict of interest situation presented in *Brohawn*," an insurer that has contracted to provide coverage for an insured's negligent actions will generally be bound by a jury's determination of negligence in the underlying tort action. *Id.* at 261. That applies, however, only if the issue of whether the underlying act was negligent (and so covered by insurance) or intentional (and so excluded) "was fairly litigated in the tort trial." *Id.* Thus, an insurer that contends that the issue was not fairly litigated must be permitted "to bring a post-tort trial declaratory judgment action" to resolve that issue. *Id.* at 262. In such a proceeding, the trial judge is first charged with "determin[ing], as a legal matter, whether the issue, which was resolved in the tort trial and which determines insurance coverage, was fairly litigated in the tort trial." *Id.* If so, the issue may not be relitigated, the inquiry ends, and the insurer is bound by the result at trial. *Id.* If not, however, "then the insurer

25

should be permitted to relitigate the matter in the declaratory judgment action." *Id.* In explaining the rationale for permitting such a challenge, the Court observed that

> while the insurance company promised to pay in accordance with the legal obligations resulting from the tort action, it did not undertake to be the victim of fraud or collusion. It is not fair to require that an insurer pay when the finding of negligence was the product of an unfair trial and when the insurer has no opportunity to litigate the matter.

*Id.* at 263.

The Court then considered whether the required declaratory judgment action was properly filed separately or should have been brought within the underlying tort suit. *Id.* at 263-64. The Court held that, going forward, such actions must be filed within the underlying tort action, primarily for reasons of efficiency. *Id.* at 264. Allowing "two separate suits involving the same parties and the same issue," the Court reasoned, "may lead to conflicting final judgments." *Id.* at 263. Moreover, there would be obvious benefits in having the same judge who presided over the tort trial "review[] whether the critical issue was fairly litigated" in that proceeding. *Id.* at 264. Thus, the Court held, "[t]he best procedure to resolve coverage disputes like the one in this case is a declaratory proceeding, as part of the tort case, initiated after the rendition of the jury's verdict or court's decision regarding liability." *Id.* To accomplish that, "no later than ten days after the entry of judgment in the tort suit," an insurer must file a motion to intervene, an appropriate post-trial motion for reconsideration, "and a complaint for declaratory relief regarding its duty to pay the damages assessed against its insured." *Id.*

We agree with Mr. Esteppe that the procedure outlined in *Atwood* provides guidance for how a tort plaintiff may proceed to establish a local government's liability under the

26

LGTCA.  Because the obligations of private insurers differ in important respects with those of local governments under the LGTCA, however, a few tweaks are necessary.  Whereas an insurer's obligation generally derives from the finding of negligence itself, *see id.* at 260-61, a local government's obligation under the LGTCA requires an additional finding that the tortfeasor employee was acting within the scope of employment, *see Johnson III*, 239 Md. App. at 550.  Thus, although an insurer is appropriately bound by the jury's verdict of negligence, absent a showing of fraud or collusion, *Atwood*, 319 Md. at 259, a local government's liability under the LGTCA depends on proof of a fact that is not an element of the underlying tort, *Johnson III*, 239 Md. at 555.  Because the local government is not liable until the tort plaintiff establishes that fact, it should not be required to intervene immediately in an underlying tort action against its employee to establish its non-liability for the judgment.  *Cf. Wilkerson v. Michael*, 104 Md. App. 730, 739 (1995) (holding that where an insurer's coverage defense is based on an issue that was not litigated in the underlying tort case, the insurer need not comply with the *Atwood* procedure).[14]

Furthermore, a statute, the LGTCA—and not a private insurance contract—establishes whether the local government is liable for any judgment.  Nothing in the statute indicates that the local government's liability should either evaporate or be established conclusively if neither party raises the issue within ten days of an underlying verdict, nor

---

[14] Of course, although a local government is not *obligated* to intervene in the underlying case to file a declaratory judgment action challenging its obligation to pay an underlying judgment, neither is it prohibited from doing so.  If a local government is aware that a demand will be forthcoming, then it is not precluded from raising the issue promptly (post-verdict) in the forum in the manner set forth in *Atwood*.

27

is it our place to add such a requirement to the statutory scheme. Although the plaintiff appropriately bears the burden to establish that the tortfeasor defendant acted within the scope of employment, we do not think it necessary to require either party to initiate a proceeding to resolve that issue as promptly as an insurer must pursue its coverage defense under *Atwood*. Indeed, because the scope of employment issue will not generally have been resolved in the underlying action, it is possible that neither party will know immediately after a verdict is rendered whether the local government's liability will be disputed and, consequently, whether an enforcement action will be necessary. Thus, while it may be more efficient to address a local government's liability for a judgment within the underlying action promptly after the resolution of that action, the claim is neither lost nor established if it is not raised on the schedule set forth in *Atwood*. Such a claim may be brought in a separate action at a later date.

### C. The Department Waived Any Objection to Mr. Esteppe's Failure to Join It as a Party by Appearing in the Action and Defending Against His Claim on the Merits Without Raising that Defense.

Mr. Esteppe did not file an action against the Department either within the underlying tort action or as a separate action. Instead, he filed in the underlying tort action a "Motion for Declaratory Relief to Enforce Judgment"—which, as discussed above, is appropriately treated as a motion for summary judgment as to the Department's liability. In that motion, he requested: (1) "a 'speedy hearing' to resolve this controversy," as permitted by the Declaratory Judgment Act, § 3-409(e) of the Courts Article; (2) a written declaration stating that "Mr. Lewellen's conduct, on which the underlying tort judgment was based, occurred in the scope of Mr. Lewellen's employment" and "that the City and

28

the Department are required to pay the judgment that Mr. Esteppe obtained against Mr. Lewellen"; and (3) "that th[e] [c]ourt order the City and the Department to pay the costs of this declaratory judgment proceeding."

The Department contends that the circuit court erred in reaching the merits of Mr. Esteppe's motion because Mr. Esteppe could only make his claim in a separately filed enforcement action, not within the underlying tort action. For the reasons already stated, we disagree. Moreover, although Mr. Esteppe did not file a new complaint and serve the Department with process as a defendant, the Department did not object to Mr. Esteppe's enforcement motion on that basis. Instead, the Department appeared in the action without contesting the court's jurisdiction over it, filed an opposition, and raised defenses. The Department argued that, absent an assignment from Mr. Lewellen, Mr. Esteppe had no standing to pursue a claim against it at all, and could only pursue recovery from Mr. Lewellen. As discussed above, we rejected a similar argument in *Johnson III* (albeit in dicta), and the Department has not pursued it on appeal. The Department also argued that Mr. Lewellen was not acting within the scope of his employment at the time of his tortious act against Mr. Esteppe and, therefore, the Department maintained its defense of sovereign immunity to Mr. Esteppe's claim. We will address that defense below in Part II.

The Department also failed to raise any objection to the manner in which Mr. Esteppe raised his claim either at oral argument or in its written opposition to Mr. Esteppe's supplemental filing. That the City did raise that defense makes the Department's failure to do so particularly noteworthy. As noted, Mr. Esteppe filed his

29

motion against both the Department and the City.  In its opposition, the City argued that

Mr. Esteppe's motion was improper because

> the City is no longer a party to the case.  The City is aware of only very limited circumstances in which a motion may be filed against a non-party, such as a motion to compel information requested by subpoena, which is not applicable to the motion here.  For this reason, Plaintiff's Motion must be denied.[15]

By appearing in this action and defending against Mr. Esteppe's enforcement claim

on the merits without raising any objection that it was not properly joined as a party, the

Department waived that defense.[16]  *See LVI Envtl. Servs. v. Acad. of IRM*, 106 Md. App.

699, 707-08 (1995) (holding that a party "waived [its] defense" of lack of personal

jurisdiction and "voluntarily submitted to the jurisdiction of the Circuit Court" by raising

only merits contentions in the circuit court and waiting until appeal to object to personal

jurisdiction); *cf. Caucus Distribs. v. Md. Sec. Comm'r*, 320 Md. 313, 336-37 (1990)

(holding that voluntary "appearance and participation in [administrative] proceedings . . .

waived any deficiency in the alleged failure of service of process").  We therefore discern

---

[15] The Department contends that it argued that it was "not a party" in both its initial opposition and its reply to Mr. Esteppe's supplemental brief.  Although the Department *stated* in those filings that it was not a party, it did so only in the context of arguing that no judgment was entered against it and so Mr. Esteppe could not pursue recovery directly from the Department—at all.  The Department did not argue that Mr. Esteppe was required to file an action naming it as a defendant; to the contrary, the Department's argument was that Mr. Esteppe could not do so—either in the tort action or in a separate action—absent an assignment from Mr. Lewellen of his right to indemnification.

[16] "[A] general appearance by an individual is a submission to the personal jurisdiction of the court over that person."  *Caucus Distribs. v. Md. Sec. Comm'r*, 320 Md. 313, 337 (1990).  "Once a party speaks to the merits of a case, the individual has made 'a voluntary appearance, submitting himself to the jurisdiction of the court for all subsequent proceedings.'"  *LVI Envtl. Servs*, 106 Md. App. at 707 (quoting *Guen v. Guen*, 38 Md. App. 578, 587 (1978)).

no reversible error in the circuit court's decision to address the merits of Mr. Esteppe's motion.

## II. THE CIRCUIT COURT ERRED IN GRANTING MR. ESTEPPE'S MOTION.

We now reach the Department's principal contention on appeal: that the motions court committed reversible error in finding that Mr. Lewellen acted within the scope of his employment. The Department presents three different grounds for its assertion of error. First, the Department contends that because Mr. Lewellen's tort was a serious criminal violation, it was not within the scope of his employment as a matter of law. Second, the Department argues that the record does not support the circuit court's conclusion that Mr. Lewellen's conduct was motivated by a purpose to serve the Department's interests, even in part. Third, the Department contends that Mr. Esteppe was estopped from even arguing that Mr. Lewellen's tort was motivated by a purpose to serve the Department's interests because of positions he took in successfully litigating his claim against Mr. Lewellen. We begin by reviewing the Court of Appeals's recent decision in *Baltimore City Police Department v. Potts*, 468 Md. 265 (2020), which will control our analysis of the Department's first two contentions.

### A. *Baltimore City Police Department v. Potts*

In *Potts*, the Court of Appeals reaffirmed the standard for determining whether a tortfeasor employee's actions were undertaken within the scope of employment, as previously set forth in *Sawyer v. Humphries*, 322 Md. 247 (1991). In *Sawyer*, the Court had restated "[t]he general test set forth in numerous Maryland cases for determining if an employee's tortious acts were within the scope of his employment." 322 Md. at 255. That

31

general test "is whether the[] [acts] were in furtherance of the employer's business and were 'authorized' by the employer." *Id.*

Because *Potts* is dispositive of the Department's primary argument and sets the standard by which we must assess the Department's secondary argument, we will discuss it in some detail. The decision in *Potts* disposed of two separate cases in which tort plaintiffs were seeking to collect from the Department judgments they had obtained against former Department officers who were part of the now-notorious Gun Trace Task Force ("GTTF").[17] 468 Md. at 271. In one case, the tort plaintiff, Mr. Potts, was walking when GTTF officers, acting without reasonable articulable suspicion, stopped him, "beat him, searched him, and found no contraband." *Id*. at 272. They then "planted a handgun on Potts, arrested him, and falsely stated in police reports that he had possessed the handgun." *Id.* They also "falsely testified that they had recovered the handgun from him." *Id.* "The officers did not steal or take anything of value from Potts," who ended up receiving a sentence of eight years' imprisonment, of which he served 19 months before his conviction was vacated. *Id.* In the other case, the tort plaintiff, Mr. James, was driving when GTTF officers, without reasonable articulable suspicion, stopped his vehicle and "demanded that James provide the name of a person who possessed drugs or a gun." *Id.* When he did not provide a name, "the officers falsely alleged that a handgun, that they had provided,

---

[17] The GTTF was "a specialized unit" within the Department "charged with interdicting illegal firearm activities in Baltimore City." *Potts*, 468 Md. at 318. In 2017, members of the GTTF were discovered to "ha[ve] engaged in what has been described as 'a wide-ranging, years-long racketeering conspiracy,' which resulted in the officers being prosecuted and convicted in the United States District Court for the District of Maryland." *Id.* at 271; *see id.* at 278-81.

32

belonged to James and arrested him." *Id.* As with Mr. Potts, "[t]he officers did not steal or take anything of value from James," who spent seven months in custody awaiting trial before being released. *Id.*

Both tort plaintiffs settled lawsuits against the GTTF officers for $32,000, and the officers assigned the plaintiffs their "right to indemnification from the City under [Courts] § 5-303(b)(1) and the collective bargaining agreement between the Department and its officers' union."[18] *Id.* at 272-73. Both cases eventually came before the Court of Appeals based on agreed-upon factual stipulations. *Id.* at 273. The primary issue before the Court was whether the GTTF officers were acting within the "scope of employment," for purposes of the LGTCA, at the time of their tortious conduct. *Id.* at 273-74. The Department contended that the officers were not acting within the scope of employment, as a matter of law, because "their actions were outrageous, personally motivated, and willfully criminal." *Id.* at 274. Conversely, the tort plaintiffs argued "that the officers acted within the scope of employment as there is no evidence that the officers personally benefitted from their actions—*i.e.*, the officers' actions were designed to further the interests of the Department, not the officers." *Id.*

The Court of Appeals first conducted an extensive review of the LGTCA and the meaning of "scope of employment" under Maryland law. In doing so, the Court focused in particular on its opinion in *Sawyer*. *Id.* at 283-84, 286-91. There, the Court had explained that

---

[18] Presumably because of these assignments, these cases did not present any of the issues we addressed above in Part I.

33

> To be within the scope of [ ] employment[,] the [employee's] conduct must be of the kind [that] the [employee] is employed to perform[,] must occur during a period [that is] not unreasonably disconnected from the authorized period of employment[, must occur] in a locality [that is] not unreasonably distant from the authorized area, and [must be] actuated[,] at least in part[,] by a purpose to serve the [employer].

*Id.* at 289 (alterations in *Potts*) (quoting *Sawyer*, 322 Md. at 255).

In establishing the framework for its analysis, the Court in *Potts* explained that in *Sawyer* it had set forth "a two-pronged 'general test' for whether an employee acted within the scope of employment." *Potts*, 468 Md. at 271. "The first prong of the *Sawyer* test is whether the employee's actions 'were in furtherance of the employer's business[,]' and the second prong is whether the employer 'authorized' the employee's actions." *Id.* (quoting *Sawyer*, 322 Md. at 255). "[A]n employee's actions are outside the scope of employment where they are 'personal, [ ] where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect [the employee's] own interests, even if during normal duty hours and at an authorized locality.'"[19] *Id.* at 290 (quoting *Sawyer*, 322 Md. at 256-57).

The Court in *Potts* discussed several appellate cases in which it and this Court had applied the *Sawyer* test. In *Sawyer* itself, the Court held that a law enforcement officer's actions in throwing rocks at the plaintiff during the first of two encounters, when the officer

---

[19] The Court in *Sawyer* made this point in the specific context of police conduct, citing numerous cases across jurisdictions for the proposition that "[e]ven though a police officer may be said to be 'on duty' all of the time, . . . a police officer acts outside the scope of [] employment where [the officer] acts for [the officer's] own personal reasons and not in furtherance of [the] employer's law enforcement function." 322 Md. at 259 (citing cases).

34

"was acting from personal motives," were not within the scope of employment. *Potts*, 468 Md. at 290-91 (quoting *Sawyer*, 322 Md. at 257-58). The officer's actions during a second encounter—which involved stopping the plaintiff and attempting to make an arrest—were less clear and so should have been resolved by a jury. *Potts*, 468 Md. at 291. The Court then discussed other cases that had adhered to this same framework. *See id.* at 291-302 (discussing *Houghton v. Forrest*, 412 Md. 578, 582-83, 592-93 (2010) (holding that a defendant officer acted within the scope of employment in directing other officers to arrest the tort plaintiff, who the defendant believed had been involved in a drug deal); *Wolfe v. Anne Arundel County*, 374 Md. 20, 22, 34 (2003) (concluding that an officer was not acting in the scope of employment when he raped a woman during a traffic stop); *Ennis v. Crenca*, 322 Md. 285, 288, 294-96 (1991) (concluding that a county councilwoman who allegedly defamed the plaintiff by publicly reporting his alleged bribe was not acting in the scope of her public duties because those duties did not encompass that act); *Prince George's County v. Morales*, 230 Md. App. 699, 705, 727 (2016) (holding that scope of employment was a jury issue where an off-duty law enforcement officer who had been hired to work security at a college fraternity party allegedly "punched [a partygoer] in the face, pinned him on the ground," and put him in a chokehold); *Clark v. Prince George's County*, 211 Md. App. 548, 578-79, 590 (2013) (holding that an officer acted outside the scope of employment in shooting delivery people at the officer's residence); *Brown v. Mayor & City Council of Baltimore*, 167 Md. App. 306, 310, 324-27 (2006) (concluding that an officer who murdered his wife's lover had not acted within the scope of employment because his actions "were completely personal").

Turning back to the cases before it, the Court in *Potts* determined that, in each, the conduct of the GTTF officers "satisfie[d] the test for conduct within the scope of employment that this Court set forth in *Sawyer*." 468 Md. at 305. Drawing on the principles enunciated in *Sawyer*—which the Court confirmed to be "the framework for analyzing whether an officer acted within the scope of employment"—the Court engaged in the required "case-specific analysis," *id.* at 306, as to which "there are few, if any, absolutes," *id.* (quoting *Sawyer*, 322 Md. at 255).

Regarding the first prong of *Sawyer*, the Court "conclude[d] that the officers' actions were in furtherance of the Department's business because they were at least partially motivated by a purpose to serve the Department, and because there [wa]s no indication that the officers were 'acting to protect [their] own interests.'" *Potts*, 468 Md. at 306 (second alteration in *Potts*) (quoting *Sawyer*, 322 Md. at 257). The Court observed that the actions the officers engaged in—"includ[ing] stopping, searching, questioning, and arresting individuals, authoring police reports, and testifying against criminal defendants"—were all standard police activities. *Potts*, 468 Md. at 306. Thus, notwithstanding that the officers' conduct was "egregious," and even though they "lacked probable cause or an arrest warrant," the nature of the conduct itself "favor[ed] concluding that the officers acted within the scope of employment." *Id.* at 307.

Furthermore, and as will be particularly relevant to our analysis, the factual stipulations "include[d] no evidence that in these two instances . . . the officers attempted to plant the handguns to serve their own interests, or that the officers' motives were anything other than to arrest. In the absence of such evidence, we cannot say that the

36

officers acted outside the scope of employment." *Id.* at 309. Reviewing the cases in which the Court (and this Court) had previously found that employees were acting outside the scope of employment, the Court noted a common thread "that the government employees were serving their own interests, not those of the governments that employed them." *Id.* at 309-10. The Court emphasized once again that the factual "stipulations in *Potts* and *James* contain no indication that the officers were serving their own interests in arresting Potts and James." *Id.* at 309.

The Court then turned to, and rejected, the Department's argument that "unprovoked, highly unusual, and quite outrageous" conduct is always outside the scope of employment. *Id.* at 311 (quoting *Sawyer*, 322 Md. at 257). The Court did not disavow its statement in *Sawyer* that "courts tend to hold that" such conduct "in itself is sufficient to indicate that the motive was a purely personal one," *id.* (quoting *Sawyer*, 322 Md. at 257), but reaffirmed that "[t]his language does not establish a hard-and-fast rule," *id.* at 312.

In assessing the second prong of the *Sawyer* test, the Court observed that "the Department did not expressly authorize the officers' misconduct." *Id.* However, "conduct may nonetheless be considered authorized where it was 'incident[al] to the performance of the duties' that the employer entrusted to the employees." *Id.* (quoting *Sawyer*, 322 Md. at 255). To determine whether that was the case, the Court considered each of ten factors it had laid out in *Sawyer* "for determining whether an employee's actions were incidental [to] those that the employer authorized." *Potts*, 468 Md. at 312. Those factors are:

(a) whether or not the act[ions are] commonly done by such [employee]s;

37

(b) the time, place[,] and purpose of the act[ions];

(c) the previous relations between the [employer] and the [employee];

(d) the extent to which the business of the [employer] is apportioned between different [employee]s;

(e) whether the act[ions are] outside the enterprise of the [employer] or, if within the enterprise, ha[ve] not been entrusted to any [employee];

(f) whether or not the [employer] has reason to expect that such [ ] act[ions] will be done;

(g) the similarity in quality of the act[ions that were] done to the act[ions that were] authorized[ by the employer];

(h) whether or not the instrumentality by which the harm is done has been furnished by the [employer] to the [employee];

(i) the extent of departure from the normal method of accomplishing an authorized result[;] and

(j) whether or not the act[ions are] seriously criminal.

*Id.* at 289-90 (paragraph breaks added) (other alterations in *Potts*) (quoting *Sawyer*, 322 Md. at 256).

After assessing each factor individually, the Court ultimately concluded that, on balance, they "weigh[ed] in favor of determining that the officers' misconduct is to be considered authorized." *Potts*, 468 Md. at 318. The Court deemed it "[m]ost notabl[e]" that "the officers were part of a specialized unit charged with interdicting illegal firearm activities in Baltimore City, *and there was no indication that they were acting for their own personal benefit* in stopping and arresting Potts and James and in engaging in the associated misconduct." *Id.* (emphasis added). On that basis, the Court held that the GTTF "officers' actions were within the scope of employment, and, under [Courts] § 5-303(b)(1), the City and the Department are liable for the settlements." *Id.* at 320. The Court reiterated that

38

future questions regarding scope of employment, even as to former GTTF officers, would require "courts [to] engage in a case-specific analysis and take into account all relevant considerations—including, if necessary, the ten factors that this Court set forth in *Sawyer*, for determining whether an employee's actions were incidental to those that the employer authorized." *Potts*, 468 Md. at 319 (citing *Sawyer*, 322 Md. at 255-56).

### B.   Mr. Lewellen's Conduct Was Not Outside the Scope of His Employment Based Solely on Its Illegal and Tortious Nature.

In briefs filed before the Court of Appeals decided *Potts*, the Department's lead argument was that Mr. Lewellen's conduct was outside the scope of his employment as a matter of law because it was "unprovoked, highly unusual, and quite outrageous." (quoting *Sawyer*, 322 Md. at 257). The Court of Appeals rejected that argument in *Potts*, holding that "[t]he illegality or tortious nature of the employee's actions alone does not establish that the conduct was outside the scope of employment." 468 Md. at 318. The unprovoked, unusual, and outrageous character of Mr. Lewellen's actions is thus a relevant consideration, but not a dispositive one.

### C.   The Motions Court Erred in Determining that the Record Established that Mr. Lewellen's Conduct Was Within the Scope of His Employment.

We turn, therefore, to the first prong of the *Sawyer* test: "whether the employee's actions 'were in furtherance of the employer's business.'" *Potts*, 468 Md. at 271 (quoting *Sawyer*, 322 Md. at 255). Here, the only evidence before the Court in assessing Mr. Esteppe's motion was the record developed in the underlying tort action against

39

Mr. Lewellen. Neither party offered or sought the opportunity to present any additional evidence at that stage.

In assessing whether Mr. Lewellen acted within the scope of his employment, the motions court provided the following analysis:

> For an act/omission to be considered within the scope of employment, an employee's conduct, a) must be of a kind the employee is employed to perform, b) must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and c) must be actuated at least in part by a purpose to serve the master. *Fidelity First Home Mortgage Co. v. Williams*, 208 Md. App. 180, 203 (2012).
>
> By that gauge, Lewellen was clearly within the scope of employment. Executing a search warrant to seize an illegal firearm is exactly the type of conduct for which Lewellen was employed. As the search was executed whilst Lewellen was on duty, and in a jurisdiction for which Lewellen had police powers, the conduct occurred in an authorized area. A primary goal of the [Department] in recent years is the seizure of illegal firearms and the arrest of those in possession of those weapons, and therefore the search, *however motivated*, furthered a purpose of Lewellen's master, the [Department].
>
> Indeed, when considering the issue at trial, [the trial judge] similarly concluded:
>
>> And it's undisputed that this officer [Lewellen] was working. It's undisputed that it was a search and seizure warrant. It's undisputed that he [Lewellen] went through the ministerial duties of filling out the probable cause statement, and filling out the Affidavit, and going to [the issuing judge] . . . .
>
> Therefore, I conclude that the [Department] is liable for the judgment held by Esteppe against Lewellen, and Esteppe's motion for a declaratory judgment as to the [Department] is GRANTED.

(Internal footnote omitted) (emphasis added).

In stating that Mr. Lewellen's conduct in seeking and executing a search warrant was "the type of conduct for which [he] was employed," the motions court was

undoubtedly correct, as it was in observing that one of the Department's "primary goal[s]" generally "[wa]s the seizure of illegal firearms and the arrest of those in possession of those weapons." But the motions court was incorrect in dismissing Mr. Lewellen's motivation for his actions as irrelevant in the scope of employment inquiry. As reaffirmed in *Potts*, whether an officer's actions "were at least partially motivated by a purpose to serve the Department," *Potts*, 468 Md. at 306, as opposed to "acting to protect [the officer's] own interests," *id.* (quoting *Sawyer*, 322 Md. at 255-57), is the very heart of the first prong of the *Sawyer* test.[20] It is thus notable that the motions court did not identify any evidence in the record that Mr. Lewellen's actions were motivated by a purpose to serve the

---

[20] Courts in other states that have held that government entities can be liable in respondeat superior for tortious acts committed by police officers with purely personal motives generally either: (1) apply different principles of vicarious liability that do not consider whether the tortious acts were committed within the scope of employment, *see, e.g.*, *Sherman v. State Dep't of Pub. Safety*, 190 A.3d 148, 154, 180-81 (Del. 2018) (en banc) (owing to the unique "coercive power that distinguishes [police officers] from most employees," treating vicarious liability for their actions under the principles of § 219 of the Restatement (Second) of Agency, which addresses "'situations in which a master may be liable for torts of servants acting solely for their own purposes and hence not in the scope of employment'" (quoting Restatement (Second) of Agency § 219 cmt. e (1958))); or (2) apply a test for scope of employment that does not consider the employee's motivation, *see, e.g.*, *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1349 (Cal. 1991) (in bank) (in applying California law, not considering employee's motivation in determining whether to extend vicarious liability); *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 461 (Ind. 2018) (Under Indiana law, "the scope of employment . . . may include acts "that the employee commits for self-gratification or self-benefit . . . ."). In Maryland, however, the LGTCA conditions the local government's liability on the employee acting within the "scope of employment," Cts. & Jud. Proc. § 5-303(b)(1), and the Court of Appeals in *Potts* has just reaffirmed adherence to the *Sawyer* test, 468 Md. at 271, which provides that, to fall within the scope of employment, a police officer's tortious conduct must be "actuated at least in part by a purpose to serve the [employer]," *id.* at 289 (quoting *Sawyer*, 322 Md. at 255).

41

Department.  Mr. Lewellen also has not identified any such evidence, nor have we found any.

To the contrary, the only evidence in the record before the motions court regarding Mr. Lewellen's motive indicates that he was acting to further his own interests.  In that regard, the record reflects:

- "[Mr. Lewellen] knew a young lady by the name of Ms. Brandi Chelchowski.  He had been friends with her for years and their relationship was a close one."

- After Mr. Esteppe ended his relationship with Ms. Chelchowski, "[s]he became more aggressive and threatening towards Mr. Esteppe to include saying things to the effect, 'I have cop friends and you're going down.'  Most specifically, on March 19, 2012, . . . she . . . said again something to the effect of, 'You're going down next week.'"

- On March 27, 2012, Mr. Lewellen applied for and obtained a search warrant for Mr. Esteppe's home by swearing out an affidavit in which he stated, falsely, that he had a confidential informant complete a drug buy from Mr. Esteppe, and that Mr. Lewellen had witnessed the transaction.

- On March 27, Mr. Lewellen "was the lead on th[e] execution of that search warrant."

- Mr. Esteppe testified that "a bunch of men . . . with guns pointed at [him]" and "yelling, 'Police' . . . bust[ed] in" his front door.  The officers, including Mr. Lewellen, searched Mr. Esteppe's home, seizing two firearms and a scale.

- At some point during the search, Mr. Lewellen said in Mr. Esteppe's presence, "Brand[i] led us to it."

This evidence led the trial court to conclude, by a preponderance of the evidence, that Mr. Lewellen had conspired with Ms. Chelchowski, and this Court agreed that his "fraudulent application for the search warrant was surely an act committed in furtherance of that agreement."  *Lewellen v. Esteppe*, No. 2009, Sept. Term 2014, 2015 WL 7941110,

at *16 (Dec. 4, 2015). The record contains no countervailing evidence that his actions were actuated, even in part, by a purpose to serve the interests of the Department.

Notably, Mr. Esteppe's characterizations of the evidence throughout the underlying tort action are to the same effect, as his attorneys successfully argued:

- "And we submit, Your Honor, that this conduct of the Defendant, Mr. Lewellen, was . . . motivated by his desire to please and remain in a relationship with [Ms.] Chelchowski."

- "[S]ubsequent to Mr. Esteppe breaking up with Ms. Chelchowski, she got involved in a relationship with the Defendant, Adam Lewellen. And then she encouraged him – as we understand it – to basically bring down Mr. Esteppe. So the motivation was to please her, and not to get Mr. Esteppe."

- "[H]e knew that this woman – who he knew, he was friends with – had broken up with David Esteppe, and . . . in fact, what maybe she knew or didn't know at that time was that Lewellen was trying to make headway with her. So, for all of the wrong motives, he was using his power – he was abusing his authority – to try to cause pain, which he succeeded in doing to someone else. . . . [His] real motive was the intentional infliction of emotional distress."

- "Mr. Lewellen[] entered into an illegal agreement with this woman who was the former girlfriend of Mr. Esteppe – and whom he was trying to court to become his girlfriend. . . .

  "[Mr.] Lewellen and [Ms. Chelchowski] entered an agreement to in essence, destroy Mr. Esteppe. And based upon that agreement – which he was all too willing to do, because he wanted to get in tight with her – he, through his agreement with her, led to conduct on his part that he was so, so trying to impress her that he was willing to put his career on the line. And in fact, he did put his career on the line, and destroyed it by going to a judge and lying under oath and obtaining a Warrant and going to Mr. Esteppe's house."

- "Imagine going outside this courthouse, and running into somebody, and ask what their reaction was to a Baltimore City Police Officer – who was trying to get in good with a girl to become his girlfriend – and he did all this stuff. . . . I think the average person on the street

43

> would be outraged that a Baltimore City Police Officer could get away with that."

At no point during the underlying proceeding did either party identify a motive for Mr. Lewellen's conduct other than his purely personal desire to please Ms. Chelchowski.

Mr. Esteppe argues that even if we conclude that Mr. Lewellen's actions were driven in part by personal motives, the record reflects that his actions were also motivated at least in part by a desire to further the Department's purposes because: (1) he was performing police activities before and during the search; (2) he conducted the search in a manner consistent with the furtherance of law enforcement objectives; (3) he achieved a law enforcement purpose by successfully recovering firearms that Mr. Esteppe possessed unlawfully; and (4) there was no conclusive proof that he acted for purely personal reasons. Regarding the first two points, although many of Mr. Lewellen's actions appeared to be police activities of the type police officers working within the scope of employment would ordinarily perform, that is not dispositive. If it were, the Court of Appeals in *Potts* would not have repeatedly emphasized the absence of evidence of a personal motive on the part of those officers. *See* 468 Md. at 274-75, 309-10, 313, 318. Here, the only evidence before the motions court indicates that Mr. Lewellen's motives were personal.

Regarding the third point, the scope of employment analysis does not turn on serendipity. The circuit court concluded that the perjured affidavit and subsequent search of Mr. Esteppe's home served a purpose of the Department because it resulted in the seizure of illegally possessed firearms. But that seizure was entirely fortuitous because the warrant was authorized only as a result of Mr. Lewellen's false allegation that Mr. Esteppe was a

44

drug dealer. The record is devoid of any reason to believe that Mr. Lewellen thought Mr. Esteppe possessed illegal firearms.[21] It cannot be the case that the determinant of whether a police officer was acting within the scope of his employment when carrying out a personal vendetta is whether the officer fortuitously discovers that the object of the vendetta has engaged in some criminal act.

Finally, Mr. Esteppe bore the burden to prove that Mr. Lewellen acted, even in part, to further the Department's interests; the law does not require the Department to disprove that beyond all doubt. It is therefore enough that the record submitted in connection with Mr. Esteppe's motion contains evidence of only one motive for Mr. Lewellen's actions— a personal desire to please Ms. Chelchowski. Because Mr. Esteppe failed to establish, based on undisputed facts in the record before the motions court, that Mr. Lewellen's actions were actuated at least in part by a purpose to serve the Department, he failed to satisfy the first prong of the *Sawyer* test.[22] As a result, the motions court erred in entering

---

[21] In Mr. Lewellen's search warrant affidavit, firearms and ammunition were included in the list of items to be seized based only on Mr. Lewellen's boilerplate attestation that firearms and ammunition, among many other items, were generally maintained by drug-traffickers "in connection with their drug-trafficking activities." Tellingly, as the Department points out, had Mr. Lewellen had knowledge sufficient to establish probable cause that Mr. Esteppe illegally possessed firearms, he would have had no reason to make his false allegations about the confidential informant and drug dealing.

[22] Because we conclude that Mr. Esteppe could not satisfy the first prong of the *Sawyer* test based on the factual record before the motions court, we need not address the second prong of that test. We also decline to address the Department's alternative argument that Mr. Esteppe was estopped from arguing that Mr. Lewellen was motivated by a desire to further the Department's interests because of positions Mr. Esteppe had taken previously in the litigation. Before the circuit court, the Department made that argument only in a footnote and the circuit court did not decide the issue. If the Department raises

what was, in effect, summary judgment in favor of Mr. Esteppe. We will, therefore, reverse the circuit court's judgment and remand for further proceedings consistent with this opinion.[23]

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**

---

the issue on remand, the circuit court will have the opportunity to consider it in the first instance.

[23] As we noted at the outset of our discussion, we treat Mr. Esteppe's "Motion for Declaratory Relief to Enforce Judgment" as a motion for summary judgment on the issue of the Department's liability. The Maryland Rules do not contemplate a "motion for declaratory relief," neither party filed a complaint for declaratory judgment, and the court did not conduct a trial. The Department also did not file its own motion for summary judgment. In the current procedural posture, we do not think the question of whether the record would have supported a judgment in favor of the Department is properly before us. On remand, it will be appropriate for the court to direct Mr. Esteppe to file an appropriate pleading on which further proceedings may take place.